219 F.3d 869 (9th Cir. 2000)
 JAMES E. ADLER, aka Jaime Adler; EL SURTIDOR DEL HOGAR, S.A.DE C.V., a Mexican Corporation, Plaintiffs-Appellees-Cross-Appellants,
v.
THE FEDERAL REPUBLIC OF NIGERIA, a Sovereign State; CENTRAL BANKOF NIGERIA; PAUL OGWUMA, aka Paul Oguma; NIGERIAN NATIONAL PETROLEUM CORPORATION, Defendants-Appellants-Cross-Appellees,
and
PETITION FOR CHIEF ABBA GANNA HEN GEORGE; C. ODIBO, BALLA PETERS; STANLEY EKE; SOLOMON DANIELS; CLEMENT VICTOR ODOZI, CHIEF JOHN OLISA A. AHMED; MAJOR USMAN DAVID PASCAL UZO; UKPO AKPAN; CHIKE OKONKWO; ALHAJI JUBRIL ABDULLAHI; ANDREW AYOMANU; EDMUND ODAFE; MALLAM ABUBAKAR; A. AHMED; PASCAL UZO, Defendants-Cross-Appellees.
 No. 98-55456, 98-55460
 
 Office of the Circuit Executive
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted November 2, 1999--Pasadena, California
Filed May 17, 2000
As Amended on Denial of Rehearing and Rehearing En Banc August 17, 2000
 [Copyrighted Material Omitted]
 Richard E. McCarthy, Solomon, Ward, Seidenwurm & Smith, San Diego, California, for the plaintiffs-appellees-crossappellants.
 David H. Fromm, Chalos & Brown, New York, New York, attorneys for the defendants-appellants-cross-appellees.
 Appeal from the United States District Court for the Southern District of California, Irma E. Gonzalez, District Judge, Presiding; D.C. No. CV-94-00779-IEG
 Before: Harry Pregerson, John T. Noonan, and Diarmuid F. O'Scannlain, Circuit Judges.
 PREGERSON, Circuit Judge:
 
 
 1
 At the center of this case is an illegal contract between plaintiff James Adler and various Nigerian individuals, including at least one government official, to convert Nigerian government funds for their personal use. The individual Nigerian defendants proposed the agreement to Adler, but did not perform their side of the bargain. Adler did perform, and now seeks to recover over five million dollars he paid to further the illegal contract and to bribe Nigerian government officials. The issue before this court is whether this criminal activity falls within the "commercial activity " exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. S 1330 et seq. The district court held that the defendants were not immune from suit, but applied the unclean hands doctrine to bar Adler from recovering. Defendants appeal and plaintiffs cross-appeal. We have jurisdiction under 28 U.S.C. S 1291, and we affirm. We hold that an illegal contract constitutes commercial activity under the FSIA. We also affirm the district court's factual findings, and its application of the clean hands defense to bar Adler's recovery.
 
 
 2
 * Plaintiffs in this case are James E. Adler and El Surtidor del Hogar, S.A. de C.V. ("El Surtidor"). Adler is a United States citizen who resides in California and is president and controlling shareholder ofEl Surtidor. El Surtidor is a Mexican corporation with its principal place of business in Tijuana, Mexico. Defendants are the Federal Republic of Nigeria, the Central Bank of Nigeria ("CBN"), and seventeen Nigerian officials.
 
 
 3
 The events in this case began in August 1992 when Adler received a letter signed by Chief Abba Ganna. The letter proposed a "business transaction" between Adler, Ganna and the Chief Accountant of the Nigerian National Petroleum Corporation ("NNPC"). Ganna explained the transaction as follows:
 
 
 4
 [D]uring the last civilian regime here in Nigeria, the elected members of the ruling party used their positions and formulated companies and awarded themselves contracts which were fantastically over invoiced in various government ministries.
 
 
 5
 On the overthrow of the regime by the present military government, an enquiry was set to this. Findings and recommendations were made to the government who has given its blessing for the payment of these contracts half/fully executed. You can now see that there is a good deal for these government officials presently in office hence the ousted notable party stalwarts can not come forward for some of the claims.
 
 
 6
 Ganna requested that Adler send (1) four signed and stamped copies of El Surtidor letterhead and pro forma invoices; and (2) the number to a foreign bank account where 130 million dollars could be deposited. In addition, Adler would be responsible for purchasing first-class airplane tickets for Nigerian officials to travel to Mexico to collect their share of the money. In exchange for providing these services, Adler would earn a forty percent commission. The remaining sixty percent of the stolen funds would be divided between "miscellaneous expenses" (ten percent) and "the government officials" (fifty percent). As requested, Adler sent the letterhead, invoices, and the number of a bank account in the Grand Cayman Islands.
 
 
 7
 In September 1992, Adler traveled to Nigeria and was permitted to enter the country with a document from the Federal Ministry of Internal Affairs in lieu of a visa. He visited the home of the Minister of Finance and an office of the CBN where he met with various individuals who identified themselves as Nigerian government officials. Among these "officials" was John Olisa, Deputy Governor of the CBN. Olisa showed Adler a bank draft for sixty million dollars made out to El Surtidor and Jaime Adler, and presented Adler with a contract which Adler signed without reading. Olisa told Adler that he would give him a copy of the contract after Adler deposited funds to cover the difference in the exchange rate between the U.S. dollar and the Nigerian nira ("shortfall deposit funds"). Adler was led to believe that the Nigerian government had assigned to El Surtidor rights under a contract between the NNPC and Strabarg Company, another foreign company, for the computerization of Nigerian oil fields.
 
 
 8
 Beginning with Olisa's request for the shortfall deposit funds, individuals, whom Adler believed to be officials of the Nigerian government, repeatedly requested payments from Adler. They described these payments variously as shortfall deposit funds, taxes, processing fees, confirmation fees, surcharges, legal fees, travel expenses, and gratification. Almost every time that someone requested a payment from Adler, that individual told Adler that as soon as he made that payment, the sixty million dollars would be deposited into his account. Adler continued making payments to Nigerian officials even after he filed this lawsuit. These payments totaled $5,180,000.
 
 
 9
 In May 1993, Adler hired a Nigerian lawyer to prepare an affidavit declaring that El Surtidor and Strabarg were sister companies. Adler was told that it was necessary to submit the false affidavit to aNigerian court in order to obtain the promised funds.
 
 
 10
 Between August 1992 and July 1994, Adler corresponded, by mail and by telephone, with a variety of individuals who represented themselves as officials of the Nigerian government. In addition, Adler made two more trips to Nigeria prior to filing this lawsuit. In December 1992, he visited Olisa's residence. On the April 1994 trip, Adler met with Paul Ogwuma, Governor of the CBN.
 
 
 11
 In November 1993, Adler borrowed $450,000 from Banca Serafin to pay a stamp duty tax. As a condition of the loan, Banca Serafin conducted due diligence and required Adler to change the routing instructions for the sixty million dollars from his Grand Cayman Islands' bank account to Banca Serafin's New York bank account. On Adler's authorization, a Banca Serafin official directed Dr. Clement Odozi, another Deputy Governor of the CBN, to send the sixty million dollars to New York.
 
 
 12
 In February 1994, Adler hired former Congressmen Mervyn Dymally and Jim Bates to assist him in collecting the sixty million dollars. Dymally traveled to Nigeria, investigated the situation, and reported to Adler that the agreement was a "scam." Even after receiving this report, Adler continued to make payments requested by the Nigerian officials.
 
 
 13
 In May 1994, Adler filed this suit in district court, naming as defendants the Federal Republic of Nigeria, the CBN, the NNPC,[1] and seventeen Nigerian officials.[2] Adler alleged claims for fraud, conspiracy to commit fraud, and negligence, among others. Defendants moved to dismiss on the basis of the FSIA, but the district court denied their motion. This court affirmed, holding that the commercial activity exception to the FSIA applied because the contract between the NNPC and Strabarg, along with the assignment to El Surtidor, constituted commercial activity, and that Nigeria's contractual obligation to make payment to Adler in New York was a direct effect in the United States. See Adler v. Federal Republic of Nigeria, 107 F.3d 720 (9th Cir. 1997).
 
 
 14
 The case proceeded to trial. After an eight day bench trial, the district court found, among other things, that (1) no contract existed between the NNPC and Strabarg and therefore, the NNPC could not have assigned Strabarg's rights to El Surtidor; (2) the Ganna letter involved criminal activity on its face and Adler knowingly and intentionally participated in that activity; (3) Adler believed that he was dealing with Nigerian government officials and that the scheme was sanctioned by the Nigerian government; (4) Adler paid bribes totaling 2.11 million dollars to Nigerian officials in violation of California bribery law, Cal. Penal Code S 7(6), and the Foreign Corrupt Practices Act, 15 U.S.C. S 78dd2; (5) Adler, through Banca Serafin, instructed the Nigerian officials to deposit the funds in New York; (6) at least one official of the Nigerian government, CBN Governor Paul Ogwuma, participated as a co-conspirator in the fraud against Adler; and (7) the Nigerian government permitted other co-conspirators to use the CBN offices to further the fraud. On these facts, the district court decided that the unclean hands doctrine barred Adler from recovering the money he paid to Nigerian government officials.[3] district court also revisited the sovereign immunity question and reaffirmed that the commercial activity exception applied.
 
 II
 
 15
 We begin with the question of jurisdiction which is a question of law that we review de novo. See In re estate of Ferdinand Marcos Human Rights Litigation, 94 F.3d 539, 543 (9th Cir. 1996). The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." Argentine Republic v. Amerada Hess Shipping Co., 488 U.S. 428, 443 (1989). Under the FSIA, a foreign state is presumptively immune from suit in federal court unless one of the exceptions to the statute applies. See 28 U.S.C. S 1604. There is no dispute here that the Federal Republic of Nigeria, the CBN, and Ogwuma fall within the FSIA's definition of a foreign state. See 28 U.S.C. S 1603(a) ("A `foreign state' . . . includes . . . an agency or instrumentality of a foreign state."); Chuidian v. Philippine Nat'l Bank, 912 F.2d 1095, 1106-06 (9th Cir. 1990) (holding that government officials fall within the definition of an "agency or instrumentality " of a foreign state). The only issue in dispute is whether the FSIA's commercial activity exception applies to the facts of this case.[4]
 
 
 16
 The commercial activity exception to the FSIA denies foreign states immunity from suit in three circumstances:
 
 
 17
 A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.
 
 
 18
 28 U.S.C. S 1605(a)(2) (emphasis added). The third clause is at issue here because this suit is based on the defendants' acts of fraud, conspiracy, and negligence which occurred outside of the United States. Defendants contend that the FSIA's commercial activity exception does not apply because (1) their acts were not "in connection with a commercial activity"; and (2) their acts did not have a direct effect in the United States.[5] We disagree.
 
 
 19
 * The FSIA defines "commercial activity" as "a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. S 1603(e). It also instructs that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." Id. The agreement between Adler and the Nigerian officials was a commercial transaction.The Nigerian officials contracted for Adler's services: they offered Adler a commission if he would provide them with stamped letterhead, invoices and a bank account to which they could transfer money. Adler accepted their offer. A contract for services is plainly commercial in nature. The fact that the contract was for an illegal purpose, and therefore was unenforceable, does nothing to destroy its commercial nature. See Saudi Arabia v. Nelson, 507 U.S. 349, 366 (1993) (White, J., concurring) (stating that torture of plaintiff by police was not commercial activity, but torture of plaintiff by government hired thugs would be commercial activity); Braka v. Multibanco Comermex, S.A., 589 F.Supp. 802, 805 (S.D.N.Y. 1984) (holding that the sale of unregistered securities is commercial activity under the FSIA)[6].
 
 
 20
 Not all criminal activity falls within the FSIA's commercial activity exception. That proposition is wellestablished by decisions of this court and others. See Berkovitz v. Islamic Republic of Iran, 735 F.2d 329, 331 (9th Cir. 1983) (finding that murder is not commercial in nature); see also MCI Telecommunications Corp. v. Alhadhood , 82 F.3d 658, 664 (5th Cir. 1996) (finding that making unauthorized telephone calls is not commercial activity); Cicippio v. Islamic Republic of Iran, 30 F.3d 164, 167-68 (D.C. Cir. 1994) (holding that kidnaping is not commercial activity); Letelier v. Republic of Chile, 748 F.2d 790, 797 (2d 1984) (holding that assassination is not commercial activity). Our decision today does not conflict with that case law. Each of those cases involved illegal activity devoid of any commercial component. What this case involves, and what drives our decision in this case, is the district court's finding that Adler and the Nigerian officials made a contract for illegal activity[7].
 
 
 21
 The Supreme Court's decision Republic of Argentina v. Weltover, 504 U.S. 607, 612 (1992), also supports our conclusion that an illegal contract is commercial activity. That case involved the question whether the Argentine government acted "in connection with commercial activity " when it refinanced bonds in order to stabilize the national currency. The Court held that "when a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are `commercial' within the meaning of the FSIA." Id. at 614. It further explained that "the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in `trade and traffic or commerce.' " Id. (quoting BLACK'S LAW DICTIONARY 270 (6th ed. 1990)).
 
 
 22
 The agreement to convert Nigerian government funds satisfies the Weltover definition of commercial activity. When the Nigerian officials offered Adler a cash commission for participating in an enterprise for mutual advantage, they did essentially what every private party does in the open market (notwithstanding the factthat their precise undertakings were illegal).
 
 B
 
 23
 Having concluded that this suit is based on acts "in connection with a commercial activity," we turn to the second question: whether the defendants' acts caused a direct effect in the United States. "[A]n effect is `direct' if it follows as an immediate consequence of the defendant's activity. " Weltover, 504 U.S. at 618 (internal quotation marks omitted). In adopting the "immediate consequences" rule, the Supreme Court rejected the more onerous "substantial and foreseeable" test employed by many circuits. See id. Following Weltover, this court reaffirmed the rule that a direct effect requires that " `legally significant acts giving rise to the claim occurred' " in the United States. Adler, 107 F.3d at 727 (quoting United World Trade v. Mangyshlakneft Oil Production Ass'n , 33 F.3d 1232, 1239 (10th Cir. 1994)).
 
 
 24
 We have little trouble identifying a direct effect in the United States caused by the defendants' acts. Adler used the United States mails and telephones to commit bribery in violation of the FCPA as an "immediate consequence " of the defendants' acts. The defendants asked Adler for bribe payments, and persuaded Adler to pay them by telling him that sixty million dollars would be deposited in his bank account if he did so. Therefore, Adler's payment of bribes was an immediate consequence of the defendants' fraudulent acts. Adler's acts of bribery are legally significant with respect to the tort claims because Adler seeks to recover the money he paid in bribes[8].
 
 III
 
 25
 On appeal, defendants ask us to reverse several of the district court's factual findings. Specifically, defendants challenge the following findings of fact: (1) Adler met CBN Governor Paul Ogwuma and Ogwuma was a co-conspirator in the conspiracy to defraud Adler; (2) Ogwuma sent Adler letters requesting payments; (3) Adler paid Ogwuma $50,000; (4) Adler met the Nigerian Minister of Finance at the Minister's home; (5) Adler met John Olisa and Olisa is a Deputy Governor of the CBN; (6) Adler received a Revenue Collector's Receipt showing payment of $300,000; (7) the Nigerian government required a shortfall payment of $570,000; (8) Adler paid various fees and taxes to the Nigerian government; (9) Brigadier Ball Peters was Unit Commander for the Presidential Task Force on Trade Malpractices of CBN; and (10) Dr. Clement Odozi was the Deputy Governor of the CBN.
 
 
 26
 We review a district court's factual findings for clear error. See Fed. R. Civ. P. 52(a); Adler, 107 F.3d at 729. "We accept the lower court's findings of fact unless upon review we are left with the definite and firm conviction that a mistake has been committed." United States v. Doe, 155 F.3d 1070, 1074 (9th Cir. 1998) (en banc). We may not reject the district court's "account of the evidence [if it] is plausible in light of the record viewed in its entirety." Id. Here, the district court's factual findings present a plausible account of the evidence, and therefore defendants' challenge fails to satisfy the clear error standard.
 
 IV
 
 27
 On cross-appeal, Adler argues that the district court erred in applying the unclean hands doctrine. The uncleanhands doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." Precision Inst. Mfg. Co. v. Automative Maintenance Machine Co., 324 U.S. 806, 814 (1945). Under this doctrine, plaintiffs seeking equitable relief must have "acted fairly and without fraud or deceit as to the controversy in issue." Ellenburg v. Brockway, Inc., 763 F.2d 1091, 1097 (9th Cir. 1985) (citing Johnson v. Yellow Cab Transit Co., 321 U.S. 383, 387 (1944); Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245 (1933)). The district court decided that Adler dirtied his hands by intentionally attempting to aid and abet the Nigerian officials' scheme to steal from the government treasury and by paying bribes.
 
 
 28
 Under California law, we review the district courts decision to apply the unclean hands doctrine for an abuse of discretion. See Health Maintenance Network v. Blue Cross of Southern California, 202 Cal. App.3d 1043 (1988). A district court "abuse[s] its discretion if it base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." Cooter & Gel v. Hartmarx Corp., 496 U.S. 384, 405 (1990); see also United States v. Washington , 98 F.3d 1159, 1162 (9th Cir. 1996).
 
 
 29
 In deciding whether Adler's unclean hands barred relief, the district court applied the correct legal standard. In California, the unclean hands doctrine applies not only to equitable claims, but also to legal ones. See Jacobs v. Universal Development Corp., 53 Cal. App.4th 692, 699 (1997). The court examined, as California law requires, the nature of the misconduct at issue and the misconduct's equitable impact on the relationship between the parties and the injuries claimed. See Unilogic v. Burroughs, 10 Cal. App.4th 612, 619-20 (1992) (citing Blain v. Doctor's Co., 222 Cal. App.3d 1048, 1060 (1990)).
 
 
 30
 Nevertheless, Adler puts forth a variety of arguments in an attempt to persuade this court that inequity results from the district court's exercise of discretion. He asserts that he and the Nigerian officials are not equally at fault; that the Nigerian officials will be unjustly enriched if they do not return the funds to Adler; and that this court should grant Adler a remedy because, by doing so, it will discourage Nigerian officials from perpetrating such schemes in the future. Whatever the merits of these arguments, the district court did not abuse its discretion in reaching the opposite conclusion.
 
 
 31
 First, it is not clear that Adler is any less blameworthy than the Nigerian officials. The Nigerian officials proposed the criminal scheme, but Adler voluntarily participated it. And while the Nigerian officials successfully defrauded Adler of over five million dollars, Adler attempted to steal sixty million dollars from the Nigerian government. Second, the fact that the defendants will receive a windfall is not an absolute bar to the unclean hands defense. See Wallace v. Opinham, 73 Cal. App.2d 25, 26 (1946) (applying the unclean hands rule in a fraud action in which the parties engaged in illegal gambling and the defendant used marked cards). Finally, it is not clear that justice would be served by compelling the Nigerian government to return the money to Adler. Making a judicial remedy available when the bribe fails to accomplish the intended result would reduce the risk inherent in paying bribes, and encourage individuals such as Adler. In short, public policy favors discouraging frauds such as the one perpetrated on Adler, but it also favors discouraging individuals such as Adler from voluntarily participating in such schemes and paying bribes to bring them to fruition.
 
 
 32
 Finally, Adler relies heavily on two cases, neither of which are analogous to the case before us. In the first case, R. D. Reeder Lathing Co. v. Cypress Ins. Co, 3 Cal. App.3d 995 (1970), the California Court of Appeals held that the plaintiff could bring an action for fraud based on an illegal contract. See id. at 999. That case differs in important respects: the plaintiff did not know the underlying contract was illegal when he entered into it, and the defendant had far superior knowledge about the relevant law. See id. Here, the district court found that the deal proposed in Chief Ganna's letter was criminal on its face. The second case, Crosstalk Productions, Inc. v. Jacobson, 65 Cal. App.4th 631 (1998), involved payments by plaintiffs to safeguard their rights in a legal contract. Rejecting the unclean hands defense, the court held that payments made by the plaintiffs were the result of economic duress and thus were extortionate payments, not bribes. See id. at 640-41. In the instant case, the district court specifically found that the Adler knew the contract was illegal, and that Adler paid illegal bribes.
 
 V
 
 33
 We hold that the district court properly exercised jurisdiction over this case; the district court's factual findings are not clearly erroneous; and the district court did not abuse its discretion in applying the unclean hands defense to bar Adler's recovery.
 
 
 34
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The district court dismissed the NNPC after plaintiffs rested their case.
 
 
 [2]
 Of the seventeen named officials, only Paul Ogwuma, Governor of the CBN, was served and answered the complaint.
 
 
 [3]
 The district court made factual findings pertaining to the defendants' acts of fraud, but apparently did not decide whether the defendants actually committed any of the torts alleged.
 
 
 [4]
 Our decision in Adler is not law of the case because that decision was issued before the district court found that the Strabarg contract and assignment were fictitious.
 
 
 [5]
 An additional requirement for the commercial activity exception to apply was set out in Phaneuf v. Rep. of Indonesia, 106 F.3d 302 (9th Cir. 1997). In Phaneuf, we held that a agent must act with actual authority in order to bind a sovereign under the commercial activity exception. Id. at 308. Neither party contends that Phaneuf is applicable to this case. Indeed, the thrust of defendants' argument is that the district court erred in finding that Ogwuma participated in the fraud, not that Ogwuma did so without authorization from the government.
 In any event, Phaneuf's rule does not defeat federal jurisdiction over this case. The district court found, not only that Ogwuma, Governor of the CBN, participated as a co-conspirator in the fraud, but also that the Nigerian government permitted other conspirators to use the CBN offices to further the fraud. "Once the plaintiff offers evidence that an FSIA exception to immunity applies, the party claiming immunity bears the burden of proving by a preponderance of the evidence that the exception does not apply." Joseph v. Office of Consulate General of Nigeria, 830 F.2d 1018, 1021 (9th Cir. 1987). Defendants have not sustained their burden of proving that Ogwuma and others acted without actual authority.
 
 
 [6]
 The dissent disagrees with our characterization of the agreement between Adler and the Nigerian officials as a contract for services, and contends that an agreement that is illegal either in nature or in purpose is not a commercial agreement. Neither the plain meaning of the term commercial, nor the sources cited by the dissent provide support for that proposition. See BLACK'S LAW DICTIONARY 263(7th ed. 1999) (defining "commerce" as "[t]he exchange of goods and services, esp. on a large scale involving transportation between cities, states, and nations").
 
 
 [7]
 Defendants attempt to obfuscate the issue by repeatedly declaring that the district court found that no contract existed. The district court found that there was no contract between the NNPC and Strabarg, but it also found that there was an illegal contract between Adler and the government officials to convert government funds.
 
 
 [8]
 The district court identified two other effects in the United States: (1) Adler instructed the CBN to deposit the funds in a New York bank account; and (2) Adler hired former United States congressmen to investigate the Nigerian scheme. Because we find that Adler's violation of the FCPA satisfies the "direct effect" prong, we do not decide whether the second and third effects identified by the district court are also direct effects.
 
 
 NOONAN, Circuit Judge:
 
 35
 The majority opinion opens with the declaration."At the center of this case is an illegal contract between plaintiff James Adler and various Nigerian individuals including at least one government official, to convert Nigerian government funds for their personal use." At the very center of this case, therefore, is a contract criminal in nature and purpose, which the majority for unexplained reasons contends constitutes commercial activity.
 
 
 36
 This case has no place in our courts. It began with a mistaken allegation of a fact conferring federal jurisdiction, a mistake that led to an opinion of this court properly assuming on a motion to dismiss that the allegation was true. On remand to the district court for trial, the mistake was laid bare. The factual allegation conferring jurisdiction was not true. Foundation for federal jurisdiction disappeared.
 
 
 37
 Nonetheless the trial continued because of the plaintiff's contention that he had engaged in a criminal conspiracy with officials of the Nigerian government. Jurisdiction does not exist on the foundation of this contention. A criminal conspiracy in violation of the laws of Nigeria and of the United States does not constitute commercial activity by Nigeria. Only commercial activity by Nigeria provides an exception to the immunity of this foreign state from the jurisdiction of our courts, 28 U.S.C. S 1605. As no commercial activity was conducted here, no jurisdiction exists or existed to try this case, 28 U.S.C. S 1330(c).
 
 
 38
 The Original Mistake. On July 1, 1996, the plaintiff filed his first amended complaint alleging that "the Nigerian National Petroleum Corporation [the NNPC], a quasigovernmental agency wholly owned and controlled by the Federal Republic of Nigeria, entered into a contract with a foreign corporation known as Strabarg & Company, Ltd., a company registered under the Nigerian Companies Act, 1968." The complaint went on to state that the plaintiff had accepted assignment of proceeds due under this contract to computerize oil fields in Kaduna. Nigeria and the Nigerian officials moved to dismiss on the grounds of sovereign immunity. On appeal, we said: "The district court ruled that Nigeria engaged in commercial activity by entering into an agreement for the assignment of a contract in exchange forconsideration. We agree." Adler v. The Federal Republic of Nigeria, 107 F.3d 720, 725 (9th Cir. 1997). The case returned to the district court for trial.
 
 
 39
 After trial, the district court found "that no contract existed between Adler and the NNPC. Additionally, it is undisputed that no contract existed between the NNPC and Strabarg to computerize the oil fields in Kaduna. In fact, no oil fields exist in Kaduna. Because no contract existed between the NNPC and Strabarg, no assignment of any contract could be made to Adler."
 
 
 40
 The commercial activity alleged in the complaint and accepted as commercial activity by us was thus found to be a fiction. Not only had no assignment been made but no contract to be assigned had existed, and the subject of the contract, oil fields to be computerized, did not exist. The facts on which jurisdiction had been based were now stamped as wholly bogus.
 
 
 41
 The Plaintiff's Criminal Activity. The district court further found after trial that "the evidence establishes that Adler intended to aid and abet Nigeria officials to pay themselves kickbacks." Adler was asking the court's help to recover monies paid by him "to further criminal activity. " "From August 1992, until the time that this lawsuit was filed, Adler knowingly and intentionally engaged in illegal conduct to obtain money to which he and his company were not entitled." Throughout the period in question, "Adler engaged in numerous acts of bribery." Even after the law suit was filed, "Adler made another $50,000 payment to obtain the proceeds to which he was not entitled."
 
 
 42
 After making these findings, the court concluded:
 
 
 43
 The Court finds that Adler violated the Foreign Corrupt Practices Act, 15 U.S.C. S 78dd2 (1997) . . . . Adler traveled in interstate commerce and used instrumentalities of interstate commerce to make gifts and payments to foreign officials or persons he believed were foreign officials for the purpose of influencing their decisions to assist him in obtaining or returning business.
 
 
 44
 To prove his case, the plaintiff had proved himself to have been a criminal. Unashamedly, he had sought the help of a federal court to recover the promised share of his criminal endeavors. The district court resisted this desperate undertaking.
 
 
 45
 Criminal Activity Is Not Commercial Activity. Repulsing the attempt to make a federal court an accessory to crime, the district court nonetheless held that it retained jurisdiction because this activity was commercial. The opinion on appeal accepts this conclusion. It is a conclusion contrary to the controlling statute, to relevant precedent, and to common sense.
 
 
 46
 The basic fraud, notorious in Nigeria for its practice by skilled confidence men, is known to the Nigerian police as a "419", because it is a violation of the Criminal Code Act of Nigeria, Chapter 77, S 419 (1990). A common kind of fraud, it involves no commerce and no activity of the government. To the extent, if any, that real governmental officials played a part in this "419", they were not only violating the antifraud law but various other provisions of the criminal code, including S 98 (corruption); S 103 (false claims by officials); S 104 (abuse of office); and S 422 (conspiracy to defraud the public).
 
 
 47
 The majority rests its holding of jurisdiction on the letter from Chief Abba Ganna (a wholly fictitious person) to Adler offering Adler 40% of $130 million from contracts "fantastically over-invoiced" by unnamed government officials. The letter was on the letterhead of something called "Benzil (Nig.) Ltd." and is referred to by the district court as "the Benzil letter."
 
 
 48
 The majority reasons that the activity was commercial because a contract was made between the plaintiff and the persons he supposed were Nigerian officials. The majority declares: "A contract for services is plainly commercial in nature.The fact that the contract was for an illegal purpose, and therefore unenforceable, does nothing to destroy its commercial nature." This analysis seems to suppose that any contract for any service is "plainly commercial in nature." But when a would-be murderer hires a hit man and furnishes his agent money and a gun, neither the consideration he gives nor the services he receives are commercial. Adler was not being offered $52 million in exchange for blank letterheads and his signature. He was offered this tempting amount for his services in aiding a moneylaundering operation. To say he was paid for the documents alone would be like saying the hit man was paid for the bullets he used. The services contract was a criminal instrument, proposing fraud by Adler to be compensated by criminal profits.
 
 
 49
 The majority attempts to distinguish an illegal contract from "a contract with an illegal purpose." This exercise in hairsplitting ignores the actual finding of fact by the district court: "The Court finds that, on its face, the Benzil letter (Exhibit 1) involves criminal activity and Adler participated in that criminal activity." Not only was the purpose of the contract found by the district court to be criminal, so was its nature found by the district court to be illegal: an attempt by an "obligor under a contract to assign the obligee's rights to a third party" and "to convert funds belonging to the Nigerian government" to the use of Adler and his co-conspirators. It is intrinsically alien to the marketplace to contract to defraud a government. The nature of the contract was criminal and therefore its nature was not commercial. See Weltover, 504 U.S. at 614. A contract of this kind is intrinsically evil or, in the traditional Latin phrase, malum in se.
 
 
 50
 It is sometimes difficult to distinguish what is intrinsically evil from what is wrong because it is prohibited. An example is a monopoly in violation of the antitrust laws. Arguably, at least, such a monopoly could be seen as merely malum prohibitum and a sovereign engaging in it as conducting commercial activity within the sense of the statute.
 
 
 51
 Such ambiguity does not exist where the contract in question is the instrument of fraud. No society treats fraud as innocent activity. In this case the contract that the court accepts as commercial activity was the instrument of fraud. That is not my characterization but the claim with which Adler launched this lawsuit: the defendants had defrauded him by offering him the contract purportedly signed by Chief Abba Ganna. The plaintiff is not free to repudiate his own characterization of the contract. He is in the position of contending that the government of Nigeria engaged in commercial activity by the practice of fraud, criminal both under the laws of Nigeria and the laws of California. Looked at in terms of Adler's complaint, this criminal scheme was intrinsically dishonest. Looked at in terms of Adler's own promised services pursuant to the contract, Adler entered into a criminal enterprise to hide what even the majority concedes were "stolen funds." Either way, the central contract involved fraud and constituted malum in se.
 
 
 52
 After the district court determined that the alleged contract for the computerization for the oil fields did not exist, Adler's one remaining claim was for misrepresentation and deceit. Any claim rising out of misrepresentation or deceit is expressly barred by 28 U.S.C. S 1605(a)(5)(B).
 
 
 53
 Hornbook law is that a contract is illegal if it either has an illegal purpose or was based on an illegal consideration. Witkin, Summary of Cal. Law (9th ed. 1987) Contracts S 441; 6A Corbin on Contracts S 1378 (1993). The contract with Chief Abba Ganna had an illegal purpose and was based on an illegal consideration. The alleged purpose of the contract was to moneylaunder cash fraudulently obtained at the expense of the government. The consideration offered was a portion of these criminal proceeds. Hornbook law maintains that a contract like this contractagainst good morals is malum in se. See Witkin, Summary of Cal. Law (1987) ContractsS 441. A contract which is malum in se is alien to the market.
 
 
 54
 A contract to commit murder does not become commercial activity because the hit man contracts with a payor for his services. See Letelier v. Republic of Chile, 748 F.2d 790, 797 (2d Cir. 1984). An agreement as to the ransom between kidnappers and the parents of a kidnapped child does not become commercial activity because a contract for services is thereby entered into by the kidnappers. See Cicippio v. Islamic Republic of Iran, 30 F.3d 164, 168 (D.C. Cir. 1994). A contract to evade the laws of Nigeria by furnishing false documents to deceive the government of Nigeria does not become commercial activity because there is a contract for the criminal services of the agent of the fraud; a fortiori, no commercial activity exists when the payment for the services is to be criminally-acquired and criminally-transported loot.
 
 
 55
 In the decided cases, the victim of a kidnapping could not sue in federal court the nation arranging the kidnapping because the kidnapping is not commercial activity; the victim of a murder plot could not sue federally the nation contracting for the murder, because murder is not commercial activity. We have discovered no case where the criminal himself had the effrontery to sue alleged accomplices asserting that the crimes in which he had participated were commercial activity.
 
 
 56
 It is an insult to every honest trader or businessman to suppose that a cunning criminal scheme, if initiated by a contract, is commercial activity.
 
 
 57
 It is an insult to any foreign country, and in this instance to Nigeria, to maintain that a contract proposing a fraud on the government of Nigeria is commercial activity being carried on by the government. The government is not in business to defraud itself. Corruption is not commerce.
 
 
 58
 The opinion quotes from Republic of Argentina v. Weltover, 504 U.S. 607, 614 (1992): "when a foreign government acts, not as a regulator of a market, but in a manner of a private player within it, the foreign sovereign's actions are `commercial' within the meaning of the FSIA." The opinion then declares: "The agreement to convert Nigerian government funds satisfies the Weltover definition of commercial activity" -as if a government scheming to defraud itself was acting "in the manner of a private player!" When the Supreme Court contrasted private players with regulators it did not sweep all racketeers under the role of private players; the distinction drawn was merely between government as regulator and government as manger of its own finances. The Supreme Court reiterated that to have jurisdiction the acts must be "the type of actions by which a private party engages in `trade and traffic or commerce'." Id.
 
 
 59
 The opinion takes out of context a dictum in Justice White's concurrence in Nelson, 507 U.S. at 369. Justice White opined hypothetically that governmental thugs performing torture in connection with the commercial operation of a hospital could make the government liable; it was the connection with the Saudi government's commercial activity that brought the commercial exception into play. See Cicippio, 30 F.3d at 168. There is nothing in the opinion of the court in Nelson that justifies the majority here in stretching for a dictum from a hypothetical in a concurrence.
 
 
 60
 The definition of a criminal conspiracy is an agreement to violate a law. Every conspiracy depends on this kind of contract. That a contract is made is evidence not of commercial dealing but of crime. Congress cannot have meant to make conspiracy a type of commerce for foreign governments to engage in.
 
 
 61
 The Contract Was Void. A corollary of the criminal nature of the contract is that it was void in California where the offer was accepted. Smith v. Bach, 183 Cal. 259, 262, 191 Pac. 14 (1920); R.M. Sherman Co. v. W.R. Thomson, Inc., 191 Cal. App.3d 559,563 (1987); Witkin, Summary of Cal. Law (9th ed. 1987) Contracts S 441. A void contract cannot be sued upon. It is a nullity. A nullity cannot qualify under the FSIA requirement of "a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. S 1603(d). Engaging in an act that is legally nothing is not engaging in commerce. For this reason, too, no federal jurisdiction exists.
 
 
 62
 As no commercial activity was engaged in by Nigeria, there is no occasion to consider the statutory phrase "in connection with commercial activity." Before that phrase can kick in, some commercial activity must be identified. Here there is only fraud and conspiracy and bribery from the plaintiff's first involvement up to and after this lawsuit was filed in federal court.
 
 
 63
 Two further peculiarities of the majority opinion may be observed. First, it finds "the direct effect in the United States caused by the defendants' acts" to be Adler's payment of bribes. No such finding was made by the district court. No such point was made by Adler in his briefs or in his oral argument on appeal. No doubt there is a reason that Adler did not advance this argument: it underscored his criminal conduct and his audacity in asking a federal court to help him recover payments made in defiance of federal law. It is also far from clear how the original contract with Chief Abba Ganna, if taken seriously as a business transaction, implied that Adler would bribe anyone: he was merely being asked to assist in the production of forgeries and falsified documentation.
 
 
 64
 Second, the test offered by the majority for pronouncing activity to be commercial is entirely novel and without foundation in any precedent: that the act of a sovereign is commercial if it is what "every private party does in the open market." The implication is that only what is ":uniquely sovereign" is immune. This test is not in the statute. The test has been explicitly rejected by the Supreme Court: "the question is not whether the foreign government is acting . . . with the aim of fulfilling uniquely sovereign objectives." Republic of Argentina v. Weltover, 504 U.S. at 614. It is a gloss that substitutes a wholly different term for the statutory "commercial activity."
 
 
 65
 Conclusion. In summary, the contract at the center of the crux is a contract made with a fictitious person, Chief Abba Ganna, never shown to have been an official of the Nigerian government and indeed never shown to have existed. The contract was criminal in nature and criminal in purpose. It was void under California law. On this fragile foundation the majority has found jurisdiction over a sovereign state presumptively immune from suit in our courts.
 
 
 66
 The district court threw out the plaintiff's case because of his unclean hands. This court is ready to affirm this result. But a further cleansing of the courthouse is needed. If the truth had been known, we had no jurisdiction on the first appeal. As the truth has come out at trial, we have no jurisdiction now, nor had the district court. This disgraceful effort by the plaintiff to make us parties to a criminal conspiracy should never have darkened our doors. It is time to expunge it wholly