In re Leontina HIMBER, Debtor.

Dennis H. Christen, Plaintiff,

v.

Leontina Himber, Defendant.

Bankruptcy No. SV 01–16343–KL.
Adversary No. SV 01–01575–KL.

United States Bankruptcy Court,
C.D. California.

Dec. 10, 2002.

MEMORANDUM OF DECISION ON TRIAL OF COMPLAINT FOR DETERMINATION OF DISCHARGEABILITY OF DEBT

KATHLEEN T. LAX, Bankruptcy Judge.

This adversary proceeding is about a $65,000 check which the plaintiff, Dennis Christen ("Christen"), asked the defendant, Leontina Himber ("Himber"), to cash through her bank and which she represented she would do for him. She deposited the check into her account and refused to give him the proceeds after the check cleared. These facts are not in dispute. What is in dispute is the following:

1. Whether the defendant intended to keep the proceeds when the plaintiff gave her possession and control of the check based on her representations that she would cash the check and give him the proceeds, thereby rendering the claim a nondischargeable debt under Section 523(a)(2)(A);

2. Whether the plaintiff preserved a cause of action under Section 523(a)(4) or Section 523(a)(6) by seeking a determination that the defendant's actions constituted conversion; and

3. If conversion is at issue, whether the defendant's actions constituted conversion within the meaning of Section 523(a)(6), which this court determines to be the appropriate subsection if a cause of action has been preserved.

The court raised another issue with a potential bearing on the case: Did the underlying transaction described by the plaintiff involve participation in an illegal scheme such that the plaintiff is precluded from coming to this court for redress?

*Legality of the Underlying Transaction*

■ What makes this case unusual is the transaction in which the parties were involved that lead to the $65,000 check. The testimony of the plaintiff and the defendant about the underlying transaction is diametrically opposed.

*Christen's Underlying Story—The Hungarian Project*

The gist of Christen's testimony is as follows. Christen was trying to make a movie based on a story which he was turning into a novel. For a long time, he was unsuccessful in raising any money. Then, in December 1999, Christen's friend, Charlie, told Christen about a possible source of funding from a man in Budapest, David Butelezi ("Mr.B"). Mr. B would be willing to invest in Christen's movie if Christen would help him recover approximately $15,000,000 in $100 dollar bills being held in a storage vault in Budapest. They were introduced by telephone. Mr. B., a citizen of South Africa, had brought the currency from South Africa to Budapest. He needed $37,000 to get the money out of storage.

Christen then called Himber's husband, Paul Hayland. They met and convinced Himber, then known as Tina Hayland, to put up the $37,000 needed to liberate Mr. B's cash. In return, the Haylands got a "Demand Promissory Note" providing for them to receive $100,000 within 20 days if Christen got the funds they expected from Mr. B in Budapest. If the funds were not received and the $37,000 lost, then the Haylands were to be paid from the "first revenues" of Christen's novel. In addition, Christen signed a "Credit Line Agreement" which provided for the Haylands to have a $500,000 line of credit when the funds for producing the movie were transferred from Budapest to the United States.

Christen flew to Budapest on Christmas Day, 1999. The day after he arrived,

Charlie introduced Christen to Mr. B and a translator, Kenny, at a Pizza Hut in downtown Budapest. They went to the storage vault and were shown four metal cylinders, each 3 to 3½ feet tall. When Mr. B. opened one of the containers, Christen saw black pieces of paper the size and shape of U.S. paper currency. Mr. B. picked out two or three bills, took out a syringe and applied a solution to the bills. When he did so, Christen testified, "Benjamin Franklin appeared." They took the recovered bills to a bank and were told they were genuine. Christen turned over the $37,000 to Mr. B.

Sometime later, in front of the South African embassy, Mr. B introduced Christen and Charlie to Mr. Abbot, who was said to be a chemist from the embassy ("Mr.A"). They went to a hotel room to which the containers had been moved. Another bill was tested. Then Mr. A showed them a piece of paper with a South African mint logo on it and a price. He told them that the chemicals needed to recover one container of bills would cost them $120,000. Mr. B. appeared to be shocked.[1]

Christen contacted Himber and her husband to get more money. They did so and went to Budapest.

This effort produced a Motion Picture Seed Funding Agreement, dated January 4, 2000, between Mr. B. and the Haylands in which the Haylands agreed to provide the $120,000 "for the purpose of securing the safe and successful transfer of $15,000,000" to a production company in the U.S. set to produce Christen's movie. In return, Mr. B agreed to pay the Haylands $500,000 in addition to returning their $120,000 principal. The agreement states that "[t]he $120,000 U.S. Dollars will be paid up front for the purpose of ordering the product at the Embassy... [and that Mr. B] will escort Paul Hayland to the storage facility and show him that the container in which [sic] Mr. Dennis Christen saw is still there and available." Himber initialed each page of this agreement and signed the last page.

Christen testified that Himber requested and received a demonstration of the chemical cleaning process in another hotel room in Budapest. Himber then handed a shoebox containing the $120,000 to Mr. B in the lobby of the Budapest Hilton. Directly thereafter, Himber, Paul Hayland, Christen, and Mr. B met Mr. A in another hotel room. Mr. A showed them a fax from the mint which informed them that the $120,000 size of the chemical solution was not available for another two weeks. However, they could have immediate delivery of the $165,000 size. They decided they could not wait two weeks. Himber then arranged for her friend Elena to

---

1.  Right about this time, on January 3, 2000, Paul Hayland forwarded a U.S. State Department internet warning to Christen addressed to *"ALL U.S. Citizens Living/Visiting Abroad."* The subject was *"Scams around money laundering and money transfer"* and stated: *"An increase of African personnel approaching U.S. Citizens to invest in helping them get money out of unjust homeland. The personnel have solicited embassy and embassy transport security companies as money has been somehow chemically altered so as to circumvent customs of country. Investments of from $20k to $70k will get millions out of security storage and* *either a percentage or investment for purpose of laundering funds is solicited. Usually requiring another investment due to time frame or unforeseen delays as to a second investment from investor. Second level investment is normally 3 to 5 times more than first investment. Personnel show contracts and identifications, but will be in another country before turnover is done. Some have reported taking ink covered U.S. currency and having it chemically restored after passing through customs."*

Christen testified that he and Paul and Himber discussed this warning, but decided that Mr. B was trustworthy.

bring over another $45,000 from the United States.

The money arrived. They paid it over. They met in another hotel room and started the cleansing process. Christen testified that Himber and Mr. A were in the bathroom applying the chemical solution to the bills. Kenny, Christen, and Mr. B were in the bedroom drying the bills as they were processed. Then, somehow, the bottle of solution was dropped. It broke. The solution was lost. In the midst of the ensuing screaming, according to Christen, Himber took control and said that she would find more money.

They returned to the United States. Himber's efforts were not successful and the parties disagree about whether Himber tried to get money from business associates on a false story about redeeming family property in Romania. In any case, Christen testified that he found a source who would invest $100,000 if Christen could raise $65,000. Christen then borrowed $65,000 from his friend, Stockton Gaines, from whom he got the cashier's check which is the subject of these proceedings.

### Himber's Underlying Story—A Mere Investor

Himber agrees that she raised $202,000 which she gave to Christen in the installments described above as an investment in Christen's movie. She also paid Christen's expenses in Budapest and gave Christen's family money to pay bills, spending an additional $20,000 or $21,000. Himber states that she thought the money was needed in order to get funds released in Hungary, but she disavows any knowledge of a scheme to restore U.S. currency from a blackened state with chemicals or participation in doing so beyond giving Christen the money he requested. She traveled to Budapest with her husband, met Mr. B, and concluded that he was a friendly, nice person. Himber says that she raised the money and wanted to invest in the movie but that it was her husband Paul who cajoled her into doing so and it was Paul who was Christen's confidante. She testified that she never saw any containers of money and was never told about a chemical solution. She was told that they needed another $165,000 "to finalize the deal" but she had no more resources.

Himber further testified that she believed that Christen was to pay back any money she lost on the deal and that his novel was only to be a source of repayment. She was used to relying on her husband and signed papers when she was asked to do so by him. She further stated that her husband left, disappearing from her life soon after the money was gone, and is being investigated by the LAPD.

### The Check

Christen testified that when Himber found out that it would take several days to cash the $65,000 check through Christen's small Korean bank, she said that she could cash it at her bank and give the cash right back to Christen. They went to Himber's bank in Woodland Hills where the teller informed them that they would have to have an endorsement guarantee of Christen's signature. They drove to Christen's bank in downtown Los Angeles and got the required guarantee.

By then it was late in the day and Himber said they would have to wait until the morning. Although he had misgivings, Christen said that they agreed to meet at Himber's bank at 9:15 the next morning. She did not appear the next morning. He tried to call her all day and finally reached her late in the afternoon. Himber told Christen that she had spent the day with the Los Angeles Police Department and was now convinced that they had been scammed. Christen told her that she must

return the $65,000 nonetheless and be paid out of any proceeds from the novel. She did not return the money.

Himber's testimony about the check is similar in crucial respects. Christen told her that he could not deposit the money in his bank so she said she would cash it. She stated that she would have given him the money if the teller had cashed the check. After leaving the Korean bank, she drove back to Woodland Hills and deposited the check in her account. The bank told her that it would take three days to clear. When she called Christen that night to tell him these things, he insisted that she go to the bank in the morning and get the money or the check. She called the bank in the morning and was told she could not retrieve the check and that it would take three days to clear. When she reported this to Christen, he threatened her and her family. She reported the threats to the police. She decided to keep the $65,000 because Christen threatened her after all she had done for him. She further stated that she knew it was his money and that he had borrowed it. She used the $65,000 to pay off some of the people from whom she had borrowed money for the movie.

### The Hungarian Project and The Doctrine of Unclean Hands

Putting aside the astounding credulity of the parties, regardless of whose story is true, the facts recited by Christen raise questions about the legality of the entire scheme to resurrect blackened currency. What legitimate purpose could have been served in disguising the money in the first place? Was it stolen or the proceeds of criminal activity? Were Mr. B and his cohorts, including the parties hereto, evading South African and Hungarian laws regulating export and import of cash? Did Christen have any basis for believing that the chemical treatment of the money had a legitimate basis? Would not the vast sum purportedly involved ($15,000,000) warrant some speculation and investigation? Did Christen not think it was unusual or odd to be engaged in the literal laundering of $1,500,000 in a hotel room, performing the equivalent of changing lead into gold?

The court looked to two circuit cases for guidance in considering these questions: *Adler v. The Federal Republic of Nigeria*, 219 F.3d 869 (9th Cir.2000) and *In re Uwimana*, 274 F.3d 806 (4th Cir.2001).

In *Adler*, the plaintiff made an agreement with various Nigerian individuals, including at least one government official, in which Adler and his company would facilitate conversion of approximately $130,000,000 in government funds to their personal use. In exchange, Adler and his company would receive a 40% commission. After Adler had paid out over $5,000,000 in bribes and other payments in furtherance of the scheme, he concluded that it was a scam—on him. Adler then filed suit alleging claims for various causes of action including fraud and conspiracy to commit fraud. The case proceeded to a bench trial after which the court found that the transaction, on its face, involved criminal activity and that Adler knowingly and intentionally participated in this activity. The 9th Circuit affirmed the district court's application of the doctrine of unclean hands to bar recovery by Adler.

In *Uwimana*, the former Rwandan ambassador to the United States used $55,000 in Rwandan government funds for legal assistance in obtaining asylum for himself and his family after a change in the Rwandan government following civil war. The new Rwandan government initiated suit in federal court for conversion and then, when Uwimana filed bankruptcy, for a determination of nondischargeability. Uwimana asserted, among other things, that the plaintiff had "unclean hands" because they sought to persecute Uwimana

for his political beliefs. The bankruptcy court found that even if this allegation was true, the doctrine of unclean hands would not apply in Uwimana's case. The Fourth Circuit affirmed the trial court on this issue and explained that "[a] court can deny relief under the doctrine of unclean hands only when there is a close nexus between a party's unethical conduct and the transactions on which that party seeks relief," citing *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293 (1933). *Uwimana*, 274 F.3d, at 810. The court went on, at page 811, to state that "[w]e are not open to arguments about a party's general moral fitness, but only apply the unclean hands doctrine to prevent a party from using the courts to reap the benefits of wrongdoing."

### Insufficient Evidence of Illegality

While the money laundering activity described by Christen appears to have no legitimate basis in law, the court concludes that there is insufficient evidence to support the application of the doctrine of unclean hands to Christen's case. This is so notwithstanding the court's disbelief of Christen's assertion that he never suspected that the Hungarian project involved illegal activity.[2] The court's suspicion that the money was stolen or illegally transported across international borders is not enough. Likewise, the court's suspicion that the parties did not declare the cash they carried from the United States to Hungary is not enough. There is no testimony on this point. In addition, the defendant's actions involving the check which are the genesis of the claim in this adversary proceeding stand on their own and are not an integral part of the Hungarian project. The Hungarian project is the context, not the cause of defendant's deci-

sion to keep the proceeds of the check. Finally, there is no way to know at this point in time whether the blackened pieces of paper were really U.S. currency or merely props in a scheme to defraud Christen. Given the state department warning about such schemes, it may be that the only illegal activity involved duping Christen and his former business associates.

### Nondischargeability of the Claim

#### Preservation of a Cause of Action for Conversion Under § 523(a)(6)

■ Christen's complaint in this adversary proceeding alleged a right to relief under § 523(a)(2)(A), § 523(a)(2)(B), and § 523(a)(4). Each claim for relief set out the same facts and stated that "[t]he allegations contained herein, constitute acts of breach of contract, conversion, fraud and the misappropriation of funds of Christen in the amount of $65,000 U.S. dollars plus interest and costs and give rise to Plaintiff's claims for relief as set forth herein." No specific reference is made to an entitlement to relief under § 523(a)(6).

The parties' joint pretrial statement of issues of law remaining to be litigated makes specific reference only to § 523(a)(2)(A). However, included as an issue of law is the following: "Whether Defendant's conduct constitute [sic] acts of breach of contract, conversion, fraud and the misappropriation of funds of Christen in the amount of $65,000 U.S. dollars plus interest and costs which give rise to Plaintiff's claims for relief." The parties also included the following as a disputed issue of fact: "Whether Defendant knowingly and/or intentionally converted the entire $65,000 of Christen's funds to her own use by depositing funds into her bank account."

---

**2.** Christen also testified that they decided to call it "the Hungarian Project" because

"cleansing money" sounded so wrong.

At trial, Christen argued, among other things, for relief on the grounds of conversion. Himber objected, arguing that § 523(a)(2)(A) was the only cause of action remaining for trial, based primarily on the joint pretrial statement. However, during the course of the trial, Himber did not object to the introduction of any particular evidence based on its relevance to any other cause of action. Indeed, in this case there would have been no grounds to do so. Much of the evidence presented to support Christen's claim for relief on grounds of fraud under § 523(a)(2)(A) is equally applicable to a claim for relief for conversion. Himber was not prejudiced.

Based on the foregoing, in accordance with Federal Rule of Civil Procedure 15, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7015, it is appropriate to consider the pleadings to be amended to include the issue of conversion.[3] The court finds that the presentation of the merits of the action are served by such amendment. *In re Sarbaz*, 227 B.R. 298 (9th Cir. BAP 1998).

The court further finds that nondischargeability of debt based on a claim of unlawful conversion is addressed under § 523(a)(6). *In re Thiara*, 285 B.R. 420 (9th Cir. BAP 2002); *Collier on Bankruptcy*, 15th ed. revised, ¶ 523.12.

*Unlawful Conversion Under State Law*

■ Federal law determines the nondischargeability of a debt. The elements of unlawful conversion are determined by state law. In this case, the applicable law is California law which provides that "[t]he elements of a conversion are the creditor's ownership or right to possession of the property at the time of the conversion; the debtor's conversion by a wrongful act or disposition of property rights; and damages." *In re Thiara*, at 427, citing *Farmers Ins. Exchange v. Zerin*, 53 Cal.App.4th 445, 451, 61 Cal.Rptr.2d 707, 709 (1997).

■ The evidence at trial establishes that Christen had the right to possession of the check and of the proceeds of the check at such time as the check was cashed. It is undisputed that the check was payable to Christen. It is further undisputed that the check was delivered to Himber solely for the purpose of converting it to cash to be delivered back to Christen. In fact, Himber testified that she intended to do so and only changed her mind when she felt threatened by Christen and a growing doubt about whether the money she had put into Christen's project was lost to a scam. There is no evidence that Christen ever agreed she could keep the proceeds of the check as a credit against funds she had put into the project. The written agreements between the parties provide for Christen to fund any losses only out of any net returns from his novel. There is no indication that the novel, which was published by a vanity press, has ever provided any net return. Christen testified that no net proceeds

---

**3.** FRCP 15(b) provides: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defenses upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence."

have been received. The first element of conversion under California law has been met.

It is undisputed that Himber kept the proceeds of the check in contravention of their agreement that she would cash the check and turn over the proceeds to Christen. She kept the proceeds in spite of his protests and refused his demands for turnover. Himber testified that she used the proceeds to pay debts of her own. Christen has established the second element of conversion under California law.

Christen suffered damages arising out of Himber's .action. The evidence establishes that Christen borrowed these funds and remains liable to the maker of the check for repayment. The evidence further establishes that Himber did not have rights in the proceeds as a setoff against a debt owed by Christen to Himber. Finally, it is undisputed that Himber has never returned or repaid any of the $65,000 to Christen. Christen has established the third element of conversion under California law.

*Nondischargeability Under § 523(a)(6)*

■ Section 523(a)(6) provides that an individual debtor may not discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The court must make separate inquiry as to each element, determining whether the injury is willful and whether it is malicious. *In re Su,* 259 B.R. 909, 914 (9th Cir. BAP 2001), *aff'd,* 290 F.3d 1140 (9th Cir.2002).

■ "The willful injury requirement of § 523(a)(6) is met when it is shown either that the debtor had a subjective motive to inflict the injury or that the debtor believed that injury was substantially certain to occur as a result of [her]

conduct." *Petralia v. Jercich (In re Jercich),* 238 F.3d 1202, 1208 (9th Cir.2001), *cert. denied,* 533 U.S. 930, 121 S.Ct. 2552, 150 L.Ed.2d 718 (2001).[4] In order to apply this "subjective standard," the court must examine the debtor's state of mind and "actual knowledge that harm to the creditor was substantially certain." *In re Su,* 290 F.3d at 1146. An injury is "malicious" when it is caused by "a wrongful act, done intentionally, which necessarily causes injury, and which is done without just cause or excuse." *Jercich,* 238 F.3d at 1208. *In re Thiara,* at 427.

■ In this case, Himber's testimony leaves no doubt that she knew, to a certainty, that Christen would be harmed by her refusal to turnover the proceeds of the check to him and that she intended to inflict this harm. She knew that the check represented money Christen had borrowed in order to further the movie project. She knew that she got possession of the check as a result of her representation that she would cash it and immediately give the proceeds to him. Himber's subjective intent meets the "willfulness" standard of § 523(a)(6).

Himber decided to keep the check because he threatened her. Christen's threats, even if true, do not constitute "just cause or excuse" for converting the proceeds of the check to her own use. This was a willful act, done intentionally, which necessarily caused injury.

Based on the foregoing, Christen is entitled to a judgment that Christen's claim against Himber is nondischargeable under § 523(a)(6).

*Nondischargeability Under § 523(a)(2)(A)*

■ Christen's complaint also seeks to have his claim found nondischargeable un-

---

**4.** *In re Thiara* contains a detailed and helpful discussion of conversion under California law and development of the law on nondischargeability under Section 523(a)(6) in the Ninth Circuit.

der § 523(a)(2)(A). In order to prevail Christen must demonstrate that Himber obtained the proceeds of the check by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." More specifically, Christen must prove the following elements: "(1) that the debtor made the representations; (2) that at the time she knew they were false; (3) that she made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained alleged loss and damage as the proximate result of such representations." *Diamond v. Kolcum (In re Diamond)*, 285 F.3d 822, 827 (9th Cir.2002).

■ On consideration of the testimony and the credibility of both Himber and Christen, the court finds that Himber did not form her intention to keep the proceeds of the check until after the check was deposited into her account and she was unable to retrieve it from the bank Himber's representation to Christen that she would cash the check for his benefit was true when she made it and not made with intent to deceive him.

Therefore, Christen has failed to prove an element of his prima facie case under 523(a)(2)(A) and Himber is entitled to judgment on this cause of action.

*No Claim for Nondischargeability under § 523(a)(2)(B) and § 523(a)(4)*

Although § 523(a)(2)(B) and § 523(a)(4) are raised in the complaint, the Joint Pretrial Order prepared by the parties does not list either as a cause of action for determination at trial. Section 523(a)(2)(B) applies only where the alleged nondischargeable conduct involved use of a statement in writing "respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(B). There is no evidence to support a cause of action under this provision of the Bankruptcy Code.

Section 523(a)(4) applies in cases where the plaintiff alleges a debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. No fiduciary capacity between the Himber and Christen was established and this cause of action was abandoned at or before trial.

*Conclusion*

Based on the foregoing, judgment should be awarded as follows:

1. In favor of Christen under 11 U.S.C. § 523(a)(6); and

2. In favor of Himber under 11 U.S.C. § 523(a)(2)(A), 11 U.S.C. § 523(a)(2)(B), and 11 U.S.C. § 523(a)(4).

Christen shall lodge a form of judgment within 30 days of entry hereof.