16    *Keller, et al. v. Central*
*Bank of Nigeria, et al.*                    No. 00-3369

## III.

   For the foregoing reasons, we **vacate** the district court's denial of defendants' motion to dismiss the civil RICO claims, and **remand** this case to the district court for further proceedings, consistent with this opinion.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2002 FED App. 0019P (6th Cir.)
File Name:  02a0019p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

H. HENRY KELLER; H.K.
ENTERPRISES, INC.,
         *Plaintiffs-Appellees,*

         *v.*                                          No. 00-3369

CENTRAL BANK OF NIGERIA;
PAUL OGWUMA; ALHAJI
RASHEED; ALHAJI M.A.
SADIQ,
         *Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 98-01270—Kathleen McDonald O'Malley,
District Judge.

Argued:  August 7, 2001

Decided and Filed:  January 16, 2002

Before:  KEITH, NORRIS, and BATCHELDER, Circuit
Judges.

———————————

**COUNSEL**

———————————

**ARGUED:** David H. Fromm, BROWN, GAVALAS & FROMM, New York, New York, for Appellant. Eric H. Zagrans, ZAGRANS LAW FIRM, Elyria, Ohio, for Appellee. **ON BRIEF:** David H. Fromm, BROWN, GAVALAS & FROMM, New York, New York, for Appellant. Eric H. Zagrans, ZAGRANS LAW FIRM, Elyria, Ohio, for Appellee.

———————————

**OPINION**

———————————

ALAN E. NORRIS, Circuit Judge. In this case, H. Henry Keller and his closely held corporation, H.K. Enterprises, Inc. (collectively, "plaintiff"), filed suit against certain Nigerian individuals and the Central Bank of Nigeria ("CBN"), alleging that plaintiff had been the victim of a financial scam. The issues before this court on appeal involve a civil claim brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Defendants moved for dismissal based upon the Foreign Sovereign Immunity Act ("FSIA"). The district court denied the motion, however, concluding that the allegations fell within the "commercial activity" exception to the Act. While we agree that the commercial activity exception applies, for the reasons that follow, we disagree with the district court's reasoning in its decision to deny.

**I.**

In the fall of 1994, plaintiff, a sales representative for a Michigan-based manufacturer of prefabricated mobile hospital and medical centers, was contacted by an individual identifying himself as Prince Arthur Ossai, who said that he

activity); but *c.f. Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1359 (9th Cir. 1988) (en banc) (affirming jurisdiction over civil RICO claims against the former president of the Philippines; no discussion of the "indictability" issue); *American Bonded Warehouse Corp. v. Compagnie Nationale Air France*, 653 F. Supp. 861 (N.D. Ill. 1987) (allowing civil RICO claims against an instrumentality of the French government; no discussion of the "indictability" issue). In light of *Berger*, we cannot now say that it is only the act, and not the actor, that counts for the purposes of RICO "indictability."

We note that although a foreign sovereign is not indictable, and therefore not amenable to civil RICO claims, the same conclusions may not follow for individuals who commit criminal acts; such unlawfulness may indicate that they were acting without the authority of the sovereign. *Cf. Phaneuf v. Republic of Indonesia*, 106 F.3d 302, 306-07 (9th Cir. 1997) (remanding for consideration of whether an individual acted with authority because, if he acted outside the scope of his official authority, he would not be entitled to FSIA immunity); *Brown v. Nationsbank Corp.*, 188 F.3d 579, 587 (5th Cir. 1999) (refusing to apply *McNeily* to civil RICO claims against FBI agents, even though RICO claims could not be asserted against the FBI itself because the FBI would not be indictable; affirming dismissal of civil RICO claims on other grounds). Plaintiff has not, however, argued on appeal that the individual defendants lacked authority, so the issue is not before us.

Having determined that a defendant must be indictable for a civil RICO claim to proceed, and that defendants, on the facts before us in this appeal, are not indictable in the United States for the listed RICO predicate offenses, we disagree with the rationale relied upon by the district court in its ruling on defendant's motion to dismiss.

FSIA does not provide an exception for criminal jurisdiction. As the Supreme Court has explained, "the subject-matter jurisdiction of the lower federal courts is determined by Congress 'in the exact degrees and character which to Congress may seem proper for the public good.'" *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 433 (1989) (citation omitted); *see also id.* at 436 (stating in the context of the Alien Tort Statute that under the FSIA, "immunity is granted in those cases involving alleged violations of international law that do not come within one of the FSIA's exceptions"); *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982) (jurisdiction of lower federal courts is "limited to those subjects encompassed within the statutory grant of jurisdiction"). We conclude that the FSIA grants immunity to foreign sovereigns from criminal prosecution, absent an international agreement stating otherwise.

### 2. Does Criminal Immunity Preclude Civil RICO Claims?

The remaining question is, if a foreign sovereign cannot be indicted in the United States for RICO predicate crimes, can the civil RICO claims against it proceed? Plaintiff argues that they can because RICO speaks of indictable "acts," and not "actors," and, therefore, as long as the acts alleged in the complaint constitute a qualifying criminal violation, it would be irrelevant that defendants were immune. *See* 18 U.S.C. § 1961(1)(B); *see also Southway*, 198 F.3d at 1215 n.6. This argument is unavailing in the Sixth Circuit because we have rejected civil RICO claims against the federal government on the ground that the government is not indictable. *Berger v. Pierce*, 933 F.2d 393, 397 (6th Cir. 1991) ("The assertion . . . that the FIA [Federal Insurance Administration] was engaged in a RICO conspiracy under section 1962(d) was patently defective as a matter of law, since it is self-evident that a federal agency is not subject to state or federal criminal prosecution."); *see also McNeily v. United States*, 6 F.3d 343, 350 (5th Cir. 1993) (Federal Deposit Insurance Corporation is not indictable and thus cannot engage in racketeering

was royalty and a government official in Nigeria.[1]   Ossai suggested that plaintiff grant him the exclusive distribution rights for plaintiff's hospital and emergency care facilities in Nigeria. This deal would be funded, said Ossai, with $25,000,000 on deposit at the CBN as the result of a previous government contract that had been overfunded. Ossai and plaintiff entered into an agreement, and Ossai, stating that he was acting as an agent for the Nigerian government, placed an order for five of plaintiff's mobile medical units. According to the district court's opinion, the following payment arrangements were agreed upon:

> (1) Keller would give Ossai exclusive distribution rights to sell in Nigeria mobile hospital and medical equipment supplied by Keller; (2) Ossai would then sell to Nigeria $4.1 million worth of Keller's mobile hospital and medical equipment for a purchase price of $6.63 million; (3) Nigeria would pay to Keller the $6.63 million for the equipment, plus a $7.65 million "licensing fee;" (4) Ossai would receive from the government a $9.945 million commission; and (5) the $1.275 million remaining from the $25.5 million would be used for attorney's fees, wire charges, and so on. Ossai explained that, to make the deal work, the entire $25.5 million would have to be transferred into an escrow account set up by Keller himself, and disbursements made from there.

*Keller v. Central Bank of Nigeria*, No. 1:98-CV-1270, at 4 (N.D. Ohio Feb. 28, 2000).

The funds, however, were not transferred to plaintiff's account, and defendants Paul Ogwuma, Alhaji M.R. Rasheed,

---

[1]Defendants claimed below that they never communicated with plaintiff and had no knowledge of the transactions; they said plaintiff was dealing with imposters. In the court below, plaintiff documented his contacts with defendants and verified the telephone and fax numbers as CBN numbers.

and Alhaji M.A. Sadiq, professing to act for the CBN, told plaintiff that he had to pay certain fees, wire charges, and assessments before the funds would be transferred. Plaintiff eventually paid a total of $28,950 in fees and charges. He also agreed to go to London to pick up the funds. No representative of the CBN showed up in London.

Plaintiff then realized that he was the victim of a scam. Plaintiff filed an action against the CBN, its former governor Ogwuma, six of its employees (Rasheed, Sadiq, David Hastrup, Charles Ime, Oba Adeleja, and M. Umar Bui), Prince Arthur Ossai, Ahmed Adaraniji, and two U.S. banks, Citibank NA and American Express Bank Ltd.[2] He asserted civil claims for violations of RICO, 18 U.S.C. §§ 1961 *et seq.*, common law fraud, intentional misrepresentation, and negligent misrepresentation; against Ossai, he also asserted claims of breach of contract and quantum merit. He alleged that defendants defrauded him of approximately $40,000.

The district court entered a default judgment against Hastrup, Ime, Adeleja, and Bui. The CBN, Ogwuma, Rasheed, and Sadiq (collectively, "defendants") moved to dismiss the claims against them. The district court granted the motion in part, dismissing the fraud and misrepresentation claims because it concluded that plaintiff, by entering into a scheme "that was certainly questionable, and most probably illegal," had "unclean hands" and was barred from asserting these claims in equity. *Keller*, No. 1:98-CV-1270, at 16. The court concluded, however, that defendants were not immune under the FSIA because the deal fell within the "commercial activity" exception to the Act. The court therefore allowed the civil RICO claims to go forward against the four moving defendants, who now appeal the denial of foreign sovereign immunity on the civil RICO claims.

---

[2]The American banks were sued only for seizure of any of defendants' funds in their possession.

[t]he legislative history behind the FSIA provides that the FSIA "set[s] forth the sole and exclusive standards to be used in resolving questions of sovereign immunity" and "prescribes . . . the jurisdiction of United States district courts in cases involving foreign states," S. Rep. No. 1310, 94th Cong., 2d Sess. 11-12, reprinted in 1976 U.S. CODE CONG. & ADMIN. NEWS 6604, 6610. The United States Supreme Court has also held that the text and structure of the FSIA demonstrates Congressional intent that the FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic* [*v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989)]. The *Argentine Republic* Court did not limit its conclusion concerning the FSIA to civil cases. Moreover, in peacetime situations, this country does not bring criminal proceedings against other nations. Therefore, since the FSIA is the only method of obtaining jurisdiction over foreign sovereigns, and § 1330(a) refers only to civil, and not criminal, actions there is no criminal jurisdiction over [defendant] Pechiney/Trefimetaux, an agency of the French government.

*Id.* at 843-44 (footnote omitted). The court determined that, because there was no criminal jurisdiction, the French agency's acts were not indictable for purposes of the civil RICO statute, and, therefore, the civil RICO claims failed. *Id.* at 844.

The reasoning employed in *Gould* is persuasive on the criminal jurisdiction question. The FSIA states that a "foreign state shall be immune from the jurisdiction of the courts of the United States," and does not limit this grant of immunity to civil cases. 28 U.S.C. § 1604. The statute provides that jurisdiction over a foreign sovereign will exist only if there is a relevant international agreement or an exception listed in 28 U.S.C. §§ 1605-1607. Plaintiff has not cited an international agreement regarding criminal jurisdiction over RICO claims or predicate offenses, and the

district court from exercising subject matter jurisdiction over civil RICO actions against foreign sovereigns. *See Southway*, 198 F.3d at 1216. *Southway* was a case against the CBN and the Republic of Nigeria alleging that the CBN and Nigeria had defrauded Colorado investors by having them assist in collecting money from an "over-invoiced" contract for oil drilling machinery. *Id.* at 1212-13. The *Southway* court was unpersuaded by the same "indictability" argument defendants raise here, namely, that there is no criminal jurisdiction over them and, therefore, they are immune from civil RICO claims. The court reasoned that the FSIA's silence on criminal jurisdiction meant that the statute did not provide immunity to the foreign sovereigns on civil RICO claims: "If Congress intended defendants such as CBN and RN [Republic of Nigeria] to be immune from criminal indictment under the FSIA, Congress should amend the FSIA to expressly so state." *Id.* at 1214; *see also United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir. 1997) (stating in the context of head-of-state immunity that the FSIA does not address immunity from criminal jurisdiction; affirming convictions of the former commander of the Panamanian Defense Forces for RICO and drug-related charges and noting that the United States never recognized defendant as a legitimate ruler); *United States v. Hendron*, 813 F. Supp. 973, 977 (E.D.N.Y. 1993) (concluding that the FSIA applied only to civil proceedings and refusing to dismiss an indictment involving unlicensed arms importation against a Polish director of a Polish state-owned corporation).

In contrast, an Ohio district court has dismissed civil RICO claims against an instrumentality of the French government because it determined that there was no criminal jurisdiction over the entity. *Gould, Inc. v. Mitsui Mining & Smelting Co., Ltd.*, 750 F. Supp. 838, 844 (N.D. Ohio 1990). The *Gould* court applied the opposite presumption from the *Southway* court and explained that Congress would have to create explicitly an exception to the FSIA's general immunity in order to establish criminal jurisdiction over foreign sovereigns. The court reasoned that

## II.

Ordinarily, the "denial of a motion to dismiss, even when the motion is based on jurisdictional grounds, is not immediately reviewable." *Catlin v. United States*, 324 U.S. 229, 236 (1945). However, since sovereign immunity is an immunity from trial, not just a defense to liability on the merits, the denial of a claim of sovereign immunity is immediately appealable under the collateral order doctrine as a final decision, pursuant to 28 U.S.C. § 1291. *See Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 450 (6th Cir. 1988). Where there has been a factual challenge to subject matter jurisdiction, as in this case, we review a district court's legal conclusions de novo and its factual findings for clear error. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1135 (6th Cir. 1996). The party claiming FSIA immunity bears the initial burden of proof of establishing a prima facie case that it satisfies the FSIA's definition of a foreign state; once this prima facie case is established, the burden of production shifts to the non-movant to show that an exception applies. *Gould*, 853 F.2d at 451-52. Nevertheless, the party claiming FSIA immunity retains the ultimate burden of persuasion throughout. *Id*. at 452 & n.5.

A.   *Commercial Activity Exception to Foreign Sovereign Immunity Act*

The parties dispute the applicability of immunity under the FSIA. The statute provides, in relevant part:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

28 U.S.C. § 1604. A "foreign state" includes "an agency or instrumentality of a foreign state," 28 U.S.C. § 1603(a), and normally foreign sovereign immunity extends to individuals acting in their official capacities as officers of corporations

considered foreign sovereigns. *See, e.g., El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 671 (D.C. Cir. 1996) (individual sued for actions on behalf of government bank was immune from suit under FSIA). Individuals who act outside the scope of their authority are not entitled to immunity. *See Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1106-07 (9th Cir. 1990) (explaining that "[s]overeign immunity . . . will not shield an official who acts beyond the scope of his authority," but defendant was authorized to perform the types of acts alleged, even if he did so for improper motives). Plaintiff does not contest the district court holding that defendants fall within the FSIA's definition of a foreign sovereign or instrumentality. We construe the plaintiff's silence on the authority question as a concession that, for purposes of the motion to dismiss, the individual defendants enjoyed the authority of the sovereign in the actions alleged here. The moving defendants are therefore to be deemed agents of the sovereign entitled to foreign sovereign immunity unless a statutory exception applies.

Defendants claim the district court erred when it found that the commercial activity exception applies. The commercial activity exception provides that a foreign state will not be immune in a case

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

28 U.S.C. § 1605(a)(2). Plaintiff proceeds under the third clause (alleging acts outside the United States). Defendants respond that they were not involved in commercial activity, and there was no direct effect in the United States.

## B.  Civil RICO Claims

Defendants assert that they are immune from civil RICO claims. Plaintiff responds that the commercial activity exception eliminates defendants' immunity for the civil RICO claims just as for other civil claims. Defendants' theory involves the requirements of the RICO statutes. To recover under RICO, a plaintiff must show that defendants engaged in "a pattern of racketeering activity." 18 U.S.C. § 1962(b)-(d). The "racketeering activity" relevant in this case is defined as "any act which is indictable" under several enumerated federal statutes, including the offenses alleged here, mail and wire fraud. 18 U.S.C. § 1961(1)(B). According to defendants, foreign states and their instrumentalities and agents are immune from criminal indictment under the FSIA, and as a consequence, defendants cannot be indicted for the RICO predicate offenses, and the civil RICO claims must fail.

### 1.  Criminal Indictment under the FSIA?

The FSIA provide that "[s]ubject to existing international agreements . . . a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604. The jurisdictional grant of the FSIA is silent on the subject of criminal actions:

> The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

28 U.S.C. § 1330(a).

In rejecting the defendants' RICO argument the district court quoted the Court of Appeals for the Tenth Circuit, which has concluded that the FSIA does not prohibit the

decision in *Weltover*, 504 U.S. 607. According to the *Voest-Alpine* court, when the Supreme Court rejected "the suggestion that § 1605(a)(2) contains any unexpressed requirement of 'substantiality' or 'foreseeability,'" *Weltover*, 504 U.S. at 618, this holding was an admonishment to courts not to add any unexpressed requirements to the language of the statute. *Voest-Alpine*, 142 F.3d at 894. We agree that the addition of unexpressed requirements to the statute is unnecessary, and we decline to adopt the "legally significant acts" test.

In this case, defendants agreed to pay but failed to transmit the promised funds to an account in a Cleveland bank. Other courts have found a direct effect when a defendant agrees to pay funds to an account in the United States and then fails to do so. For example, the Court of Appeals for the Fifth Circuit held that the Bank of China's failure to remit funds to a domestic seller's designated bank account in the United States caused a direct effect in United States. *Voest-Alpine*, 142 F.3d at 896. Similarly, the Court of Appeals for the Second Circuit has held that defendant's default on a letter of credit for which plaintiff had designated payment to its bank account in New York was a direct effect, whether analyzed under the "legally significant acts" test or not. *Hanil Bank v. PT. Bank Negara Indonesia*, 148 F.3d 127, 132 (2d Cir. 1998); *see also Adler*, 107 F.3d at 727 (holding that Nigeria's failure to pay plaintiff, when plaintiff had designated New York as the place of payment according to its contractual right to choose the place, was a legally significant act constituting a direct effect) (factual findings changed on remand, *see Adler*, 219 F.3d 869). The district court in the instant case correctly concluded, in accord with the other circuits, that defendant's failure to pay promised funds to a Cleveland account constituted a direct effect in the United States. We affirm the district court's holding that the commercial activity exception applies to these defendants.

### 1. Commercial Activity

Defendants advance two arguments against the commercial nature of their acts. First, they claim that the illegality of the deal alleged precludes a finding that it is commercial activity. The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). The Supreme Court has elaborated on the definition of "commercial": "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992).

Courts considering cases similar to this one have concluded that the illegality of an act does not necessarily negate its commercial character. In *Adler v. Federal Republic of Nigeria*, 219 F.3d 869 (9th Cir. 2000), the Court of Appeals for the Ninth Circuit held that an illegal "investment opportunity" contract with Nigerian government officials was commercial activity: "The fact that the contract was for an illegal purpose, and therefore was unenforceable, does nothing to destroy its commercial nature." *Id.* at 875. The Court of Appeals for the Tenth Circuit similarly found that an illegal scheme by the Central Bank of Nigeria to receive funds from an "over-invoiced" contract was commercial. The court explained that "[s]imply because the activities of a 'foreign state' are illegal . . . does not mean those activities can never be commercial in nature or connected with a commercial activity." *Southway v. Central Bank of Nigeria*, 198 F.3d 1210, 1217 (10th Cir. 1999).

In the instant case, the conduct was a deal to license and sell medical equipment, a type of activity done by private parties and not a "market regulator" function. The district

court correctly concluded that this was a commercial activity, and that any fraud and bribery involved did not render the plan non-commercial.

In defendants' second attack on the commercial element, they assert that only Ossai (who is not a party to this appeal) entered into the contract with plaintiffs, and they are not bound by his act. Implicit in this assertion is the claim that the only commercial act was the signing of the contract. This argument neglects the extended business dealings of these defendants (Ogwuma, Rasheed, Sadiq, and the CBN) with plaintiff in furtherance of the contract. The complaint alleged, and defendants do not contest on appeal, the following: plaintiff received confirmation from the CBN that the wire transfer of $25.5 million had been approved. Plaintiff and Ogwuma engaged in extended fax communications regarding the wiring of funds, and Rasheed wrote to say that there were funds on deposit at the CBN, but he wanted to become part of the deal. Plaintiff then received a fax from Sadiq about delivery of the funds. There is no reason to conclude that the continuing negotiations by other defendants at the CBN fell outside of the "commercial activity" of the arrangement.

In addition, defendants argue that Ossai acted without the actual authority of the CBN and therefore could not bind the defendants under the commercial activity exception. Plaintiff, however, relies not only on Ossai's acts but also on various acts taken by these defendants to implement the scheme. Defendants have not claimed that their own acts were outside of the authority of the CBN. We therefore conclude that defendants have not shown that the commercial activity exception should not apply. *See Adler*, 219 F.3d at 874 n.5 (finding that defendants had failed to show proof that they lacked authority thus precluding application of the commercial activity exception).

### 2. Direct Effect

Defendants claim that plaintiffs cannot establish another element of the commercial activity exception, namely, that there was "a direct effect in the United States." 28 U.S.C. § 1605(a)(2). The Supreme Court has explained that "an effect is 'direct' if it follows 'as an immediate consequence of the defendant's . . . activity.'" *Weltover*, 504 U.S. at 618 (citation omitted). In *Weltover*, the Supreme Court found a direct effect when Argentina unilaterally rescheduled the maturity dates on bonds and therefore "[m]oney that was supposed to have been delivered to a New York bank for deposit was not forthcoming." *Id.* at 619. The Court rejected the requirements, which some courts had imposed, that an act be "substantial" and "foreseeable" in order to be direct. *Id.* at 618.

Defendants argue that the direct effect statutory language means plaintiff must show a "legally significant act" occurred in the United States, as the Court of Appeals for the Second Circuit has required. *See Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 152 (2d Cir. 1991), *aff'd*, 504 U.S. 607 (without addressing the "legally significant acts" test); *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 931 (2d Cir. 1998). A "legally significant act" in the United States may be, for instance, the commission of a tort in the United States or failure to make payment when the contract designates a place in the United States as the place of performance. *See, e.g.*, *Antares Aircraft, L.P. v. Federal Republic of Nigeria*, 999 F.2d 33, 36 (2d Cir. 1993) (noting that commission of a tort and performance of a contract are analogous legal acts). The Courts of Appeals for the Ninth and Tenth Circuits have adopted the "legally significant acts" test. *Adler v. Federal Republic of Nigeria*, 107 F.3d 720, 727 (9th Cir. 1997); *United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232, 1239 (10th Cir. 1994). The Court of Appeals for the Fifth Circuit, though, has rejected it, *Voest-Alpine Trading USA Corp. v. Bank of China*, 142 F.3d 887, 894 (5th Cir. 1998), relying on the Supreme Court