*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0348p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

AMERICAN TELECOM CO., L.L.C.; AMERICAN
TELECOM GROUP-USA, L.L.C.,

     *Plaintiffs-Appellants,*

  *v.*

REPUBLIC OF LEBANON, a foreign State,

     *Defendant-Appellee.*

No. 05-2408

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-72596—Nancy G. Edmunds, District Judge.

Argued: November 2, 2006

Decided and Filed: August 29, 2007

Before: RYAN, BATCHELDER, and SUTTON, Circuit Judges.

---

## COUNSEL

---

**ARGUED:** Sheldon L. Miller, LOPATIN, MILLER, FREEDMAN, BLUESTONE & HERSKOVIC, Southfield, Michigan, for Appellants. Carl Rashid, Jr., BUTZEL LONG, Detroit, Michigan, for Appellee. **ON BRIEF:** Sheldon L. Miller, LOPATIN, MILLER, FREEDMAN, BLUESTONE & HERSKOVIC, Southfield, Michigan, Mayer Morganroth, Jeffrey B. Morganroth, MORGANROTH & MORGANROTH, Southfield, Michigan, for Appellants. Carl Rashid, Jr., James J. Boutrous, II, BUTZEL LONG, Detroit, Michigan, Michael F. Smith, BUTZEL LONG, Bloomfield Hills, Michigan, for Appellee.

---

## OPINION

---

ALICE M. BATCHELDER, Circuit Judge. American Telecom Company, LLC and American Telecom Group-USA, LLC (collectively "American Telecom") appeal from the order of the district court dismissing, under Fed. R. Civ. Pro. 12(b)(1) for want of federal subject-matter jurisdiction, their complaint against the Republic of Lebanon ("Lebanon"). The question presented is whether the district court erred by finding that Lebanon's conduct did not cause a direct effect in the United States and therefore that the 28 U.S.C. § 1605(a)(2) commercial activity exception to FSIA immunity did not apply. Finding no error, we affirm.

1

**I.**

American Telecom was a bidder for a contract to manage cellular telephone networks in Lebanon. Upon Lebanon's invitation to bid, American Telecom paid $25,000 to participate in an Auction Tender, but was disqualified without explanation during the pre-qualification stage. Due to questionable conduct by the officials conducting the Auction Tender, however, Lebanon cancelled it in favor of a New Public Tender. According to American Telecom, Lebanese officials persuaded American Telecom to pay another $5,000 and participate in the New Public Tender, with assurances of fairness and good faith. As a further condition to its being permitted to participate, American Telecom also had to submit two documents (an Expression of Interest and a Non-Disclosure Undertaking), both of which required American Telecom's acknowledgment that the bidding was not binding upon Lebanon in any way.

American Telecom claims that it spent over $500,000 preparing its bid in compliance with the Tender Information and Procedures (TIP) document, which required a $2 million tender bond. The TIP specified: "The Republic of Lebanon reserves the right to reject the offer to manage either of the Mobile Businesses through the Tender, and to discontinue the Tender at any time for any reason." Because the TIP structured the bidding to allow the qualified bidders to adjust their bids after the initial bids had been revealed, American Telecom intentionally bid $6.16 million per month, but was prepared to lower its bid to $3.99 million per month at adjustment time. In its rush to comply with the submission deadline, American Telecom submitted several documents, including the tender bond, via email (allegedly in reliance on a verbal approval by a Lebanese employee).

Lebanon disqualified American Telecom because the tender bond was an email and not an original document; it pre-qualified seven other companies, none of which was an American company. Ultimately, Detecom (a German company) won the management contract for one network ($4.2 million/month; $201 million total) and Mobile Telecom Co. (a Kuwaiti company) won the other ($4.25 million/month; $204 million total). The management contracts required each winning bidder to form a company in Lebanon, hire all the Lebanese-interim-management firm's employees who chose to remain, and deposit all revenues into a Lebanese bank account.

After its disqualification, American Telecom sued Lebanon in federal court, alleging breach of contract, fraud, promissory estoppel, and breach of quasi contract. Subject matter jurisdiction was predicated on 28 U.S.C. § 1330. American Telecom served Lebanon at its Office of the Counsel General in Detroit, Michigan, as had been agreed upon by the parties. When Lebanon failed to answer, American Telecom sought and obtained a clerk's entry of default, moved for default judgment, appeared for a motion hearing, and obtained a default judgment in the amount of $420 million. Counsel for Lebanon eventually responded, filed a special appearance in the district court, and moved to set aside the default judgment and the default. The court granted the motion and Lebanon then moved to dismiss the action for lack of subject matter jurisdiction. The district court granted this motion as well, and American Telecom now appeals both orders.

**II.**

Subject matter jurisdiction is always a threshold determination. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998) (there is no "doctrine of 'hypothetical jurisdiction' that enables a court to resolve contested questions of law when its jurisdiction is in doubt"). A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may involve a facial attack or a factual attack. *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005). "When a Rule 12(b)(1) motion attacks the factual basis for jurisdiction, the district court must weigh the evidence and the plaintiff has the burden of proving that the court has jurisdiction over the subject matter." *Id.* We review factual findings for clear error and applications of law *de novo*. *Id.*

The Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. §§ 1602-11, "grants federal district courts jurisdiction over civil actions against foreign states 'as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity' under either another provision of the FSIA or 'any applicable international agreement.'" *Republic of Austria v. Altmann*, 541 U.S. 677, 681 (2004) (quoting 28 U.S.C. § 1330(a)). The statutes say:

> The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam *with respect to which the foreign state is not entitled to immunity* either under sections 1605-1607 of this title or under any applicable international agreement.

28 U.S.C. § 1330(a) (emphasis added).

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act *a foreign state shall be immune* from the jurisdiction of the courts of the United States and of the States *except as provided* in sections 1605 to 1607 of this chapter.

28 U.S.C. § 1604 (emphasis added).

The specific exception at issue here will be discussed in Section III, *infra*. The point at this stage is the peculiar manner in which jurisdiction is acquired: first, the court presumes immunity (§ 1604) but looks for an exception (§§ 1605-07); then, only if the court finds that the "foreign state is not entitled to immunity" will the court have subject matter jurisdiction (§ 1330(a)). As the Supreme Court has explained:

> The statute must be applied by the District Courts in every action against a foreign sovereign, since subject matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity, 28 U.S.C. § 1330(a). At the threshold of every action in a District Court against a foreign state, therefore, the court must satisfy itself that one of the exceptions applies — and in doing so it must apply the detailed federal law standards set forth in the Act.

*Verlinden B.V. v. Cent. Bank of Nig.*, 461 U.S. 480, 493-94 (1983). A footnote reads:

> The House Report on the Act states that 'sovereign immunity is an affirmative defense that must be specially pleaded,' H.R. Rep. No. 94-1487, at 17. Under the Act, however, subject matter jurisdiction turns on the existence of an exception to foreign sovereign immunity, 28 U.S.C. § 1330(a). Accordingly, *even if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable* under the Act.

*Id*. at 494 n.20 (emphasis added). Elsewhere, the Court has stated similarly:

> We think that the text and structure of the FSIA demonstrate Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts. Sections 1604 and 1330(a) work in tandem: § 1604 bars federal and state courts from exercising jurisdiction when a foreign state is entitled to immunity, and § 1330(a) confers jurisdiction on district courts to hear suits brought by United States citizens and by aliens when a foreign state is not entitled to immunity.

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).

The ordinary principles of subject matter jurisdiction still apply when jurisdiction is premised on an exception to the FSIA — i.e., an order entered by a court that lacks subject matter jurisdiction is a nullity and the court's only recourse is to dismiss the case:

> Federal courts are courts of limited jurisdiction. The character of the controversies over which federal judicial authority may extend are delineated in Art. III, § 2, cl. 1. Jurisdiction of the lower federal courts is further limited to those subjects encompassed within a statutory grant of jurisdiction.

*Ins. Corp. of Ir., Ltd. v. Co. des Bauxites de Guinee*, 456 U.S. 694, 701-02 (1982).

> Courts are constituted by authority and they cannot [go] beyond the power delegated to them. If they act beyond that authority, and certainly in contravention of it, their judgments and orders are regarded as nullities. They are *not voidable, but simply void, and this even prior to reversal*.

*Vallely v. N. Fire & Marine Ins. Co.*, 254 U.S. 348, 353-54 (1920) (emphasis added).

> The objection that a federal court lacks subject-matter jurisdiction, see Fed. Rule Civ. Proc. 12(b)(1), *may be raised* by a party, or by a court on its own initiative, at any stage in the litigation, *even after* trial and *the entry of judgment*. Rule 12(h)(3) instructs: 'Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.'

*Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006) (emphasis added).[1]

### III.

American Telecom contends that the "commercial activity exception" to FSIA immunity divests Lebanon of foreign sovereign immunity. That exception states, in pertinent part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere *and that act causes a direct effect in the United States*.

28 U.S.C. § 1605(a)(2) (emphasis added). There is no dispute that Lebanon is a foreign state, *see* § 1603(a), or that the bidding for the cellular telephone management contracts was a "commercial activity," *see* § 1603(d), that occurred outside the United States. The question is whether it caused a "direct effect" in the United States, *see* § 1605(a)(2).

"[A]n effect is direct if it follows as an immediate consequence of the defendant's activity." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992). "Of course the generally applicable principle *de minimis non curat lex* ensures that jurisdiction may not be predicated on purely trivial effects in the United States. But we reject the suggestion that § 1605(a)(2) contains any unexpressed requirement of 'substantiality' or 'foreseeability.'" *Id.*

---

[1] We note, however, that these cases do not permit a *collateral* attack on subject-matter jurisdiction: "A party that has had an opportunity to litigate the question of subject-matter jurisdiction may not, however, reopen that question in a collateral attack upon an adverse judgment. It has long been the rule that principles of *res judicata* apply to jurisdictional determinations — both subject matter and personal." *Ins. Corp. of Ir.*, 456 U.S. at 702 n.9 (citing *Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371 (1940), and *Stoll v. Gottlieb*, 305 U.S. 165 (1938)).

Lower courts, however, have found this "immediate consequences" test difficult to apply. *See* David E. Gohlke, Comment, *Clearing the Air or Muddying the Waters? Defining "A Direct Effect in the United States" Under the Foreign Sovereign Immunities Act After* Republic of Argentina v. Weltover, 18 Hous. J. Int'l L. 261, 285 (1995). As a result, the Second[2] and Ninth[3] Circuits require a "legally significant act" in order to find a direct effect, the Eighth[4] and Tenth[5] Circuits find the legally-significant-act test helpful but not required, and the Fifth[6] and Sixth[7] Circuits have renounced any legally-significant-act test. *See* Joseph F. Morrissey, *Simplifying the Foreign Sovereign Immunities Act: If a Sovereign Acts Like a Private Party, Treat it Like One*, 5 Chi. J. Int'l L. 675, 687-90 (2005).

But, while the circuits have framed the inquiry differently, those differences have no impact here. The present case is easily resolved without resort to any legally significant act (or any of the other well-reasoned grounds contained in the opinions of our sister circuits). American Telecom argues[8] that *Keller v. Central Bank of Nigeria*, 277 F.3d 811 (6th Cir. 2002), is controlling. To the extent that *Keller* rejects a legally-significant-act test, that is true. *See id.* at 818. Beyond that, however, *Keller* merely stands for the proposition that a "defendant's failure to pay promised funds to a [United States] account constitute[s] a direct effect in the United States." *Id.*; *accord Voest-Alpine Trading USA Corp. v. Bank of China*, 142 F.3d 887, 889-90 (5th Cir. 1998). But Lebanon never promised to pay American Telecom anything, and even the eventual contract payments to the winning bidder were to be deposited in a Lebanese bank. The *Keller* holding does not help American Telecom.

In truth, this case is far easier than any of the cases cited above, and is perhaps the rare case in which the Supreme Court's holding in *Weltover* requires no elaboration: "an effect is direct if it follows as an *immediate consequence* of the defendant's activity." *Weltover*, 504 U.S. at 618 (emphasis added). Even by American Telecom's own description — the first sentence of which we frankly find very difficult to follow — the effect is not an immediate consequence of the activity ascribed to Lebanon:

> First and foremost, if Plaintiffs were not improperly disqualified, there is no doubt that the direct and foreseeable result of the improper disqualification of Plaintiffs was to deprive Plaintiffs from receiving the lucrative contracts at issue which derive hundreds of millions of dollars in revenue for the contract holder. Not only would

---

[2] *Filetech SA v. Fr. Telecom SA*, 157 F.3d 922 (2d Cir. 1998).

[3] *Adler v. Fed. Republic of Nig.*, 107 F.3d 720 (9th Cir. 1997).

[4] *Gen. Elec. Capital Corp. v. Grossman*, 991 F.2d 1376 (8th Cir. 1993).

[5] *United World Trade v. Mangyshlakneft Oil Prod. Assn.*, 33 F.3d 1232 (10th Cir. 1994).

[6] *Voest-Alpine Trading USA Corp. v. Bank of China*, 142 F.3d 887 (5th Cir. 1998).

[7] *Keller v. Cent. Bank of Nig.*, 277 F.3d 811 (6th Cir. 2002).

[8] American Telecom also argues that we should rely on *Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445 (6th Cir. 1988), a pre-*Weltover* case that arguably set forth a direct effect test as: "if the corporation is the primary direct, rather than indirect, victim of the conduct, *and* if injurious and *significant* financial consequences to that corporation were the *foreseeable*, rather than fortuitous, result of the conduct," *id.* at 453 (emphasis added). This statement is at direct odds with the Supreme Court's statement in *Weltover* that "we reject the suggestion that § 1605(a)(2) contains any unexpressed requirement of 'substantiality' or 'foreseeability.'" *Weltover*, 504 U.S. at 618. Accordingly, we must conclude that American Telecom's reliance on *Gould* is misplaced.

> this prevent money from being paid *into* the United States, but it would also prevent money from being paid *to* the United States. Indeed, Plaintiffs, as American corporations, would have been required to pay taxes to the United States on all earnings realized as a result of the GSM Network management contracts. . . . Furthermore, . . . all of Plaintiffs' American employees would have been required to pay Federal income taxes on the income earned by virtue of their employment.

Apt.'s Br. at 55 (emphasis in original). As is evident from this attenuated approach, the only immediate consequence of Lebanon's activity was American Telecom's disqualification from the short list of qualified bidders; everything else is entirely derivative of that action, and therefore not an "immediate consequence" and not a direct effect.

Under American Telecom's theory, the direct effect requirement is effectively excised from the statute because, under this theory, any bidding process conducted — or not conducted — anywhere in the world would have a direct effect in the United States. For example, if a U.S. bidder wins a bid, money flows to the U.S., and if the U.S. bidder loses, then no money flows to the U.S.; win or lose, according to the theory, bidding causes a direct effect. If a U.S. bidder is disqualified and does not bid at all, then no money flows to the U.S. — a direct effect. If a U.S. company is not invited to bid, then no money flows to the U.S. — another direct effect. A foreign country's failure even to conduct a bidding process would have a direct effect in the United States because no money would flow to a U.S. company that would presumably have won the bid and brought money back to the U.S. It is hard to imagine a circumstance under American Telecom's theory that would not cause a direct effect in the United States.

American Telecom complains that its payment of $30,000 to enter the bids caused a direct effect in the United States because this payment was made from an American bank. But even if this payment produced a direct effect, that effect was not *caused* by Lebanon. American Telecom was not required to submit payment from an American bank; it chose to do so, and to the extent that making that payment had a direct effect in the United States, the effect was the direct result of American Telecom's action, not Lebanon's. If American Telecom's payment to participate in a bid in Lebanon towards winning a contract to provide cellular phone service in Lebanon constitutes a direct effect in the United States, then every payment to a foreign country would qualify and the "direct effect" requirement would cease to exist. Had Congress intended so broad a rule, it surely could have written one. It did not, and "the generally applicable principle *de minimis non curat lex* ensures that jurisdiction may not be predicated on purely trivial effects in the United States." *Weltover*, 504 U.S. at 618.

Therefore, we hold that the mere act of including an American company in or excluding an American company from the process of bidding on a contract, where both parties' performance is to occur entirely in a foreign locale, does not, standing alone, produce an immediate consequence in the United States, and therefore, does not "cause a direct effect in the United States" for purposes of 29 U.S.C. § 1605(a)(2).

## IV.

For the foregoing reasons, we **AFFIRM** the judgment of the district court dismissing this case for lack of subject matter jurisdiction.