*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0026p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

FRED WESTFIELD, in his capacity as
administrator *de bonis non administratis* of
the Estate of an Alien, Walter Westfeld; FRED
WESTFIELD; ERICH WESTFIELD; HANNAH
KAHN; LINDA PLAUT; JEANNE REES; and
ROSIE SEGAL, as executor of the Estate of
Martin Segal,

     *Plaintiffs-Appellants,*

   *v.*

FEDERAL REPUBLIC OF GERMANY,
     *Defendant-Appellee.*

> No. 09-6010

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 09-00204—Todd J. Campbell, Chief District Judge.

Argued: December 10, 2010

Decided and Filed: February 2, 2011

Before: MARTIN and SILER, Circuit Judges; BELL, District Judge.[*]

_____

### COUNSEL

**ARGUED:** Overton Thompson III, BASS, BERRY & SIMS PLC, Nashville,
Tennessee, for Appellants. William S. Walton, MILLER & MARTIN PLLC, Nashville,
Tennessee, for Appellee. **ON BRIEF:** Overton Thompson III, Kathryn Hannen Walker,
BASS, BERRY & SIMS PLC, Nashville, Tennessee, Jeffrey Schoenblum,
VANDERBILT LEGAL CLINIC, Nashville, Tennessee, for Appellants. William S.
Walton, James A. Beakes III, MILLER & MARTIN PLLC, Nashville, Tennessee, Max
Riederer von Paar, RUBIN, WINSTON, DIERCKS, HARRIS & COOKE, LLP,
Washington, D.C., for Appellee.

_____

[*]The Honorable Robert Holmes Bell, United States District Judge for the Western District of
Michigan, sitting by designation.

————————————

**OPINION**

————————————

BOYCE F. MARTIN, JR., Circuit Judge.   The Heirs of Walter Westfeld, a prominent German art dealer during the 1930s, seek to recover the value of Westfeld's art collection from the Federal Republic of Germany.  Westfeld had attempted to remove his art collection to Tennessee but, before he could do so, Nazi officials seized and sold off the collection.  The district court granted Germany's motion to dismiss, holding that the Heirs' claims were barred by the Foreign Sovereign Immunities Act, and do not fall within the exception for acts in connection with commercial activity.  On appeal, the Heirs make a compelling argument that while other plaintiffs raising similar claims have not fallen within the commercial activity exception, their claims do fall within a literal reading of the text of the exception and should be allowed to proceed.  However, while the Heirs present a very persuasive explanation of why Germany's actions were in connection with commercial activity, they fail to establish that Germany's actions had a sufficiently direct effect in the United States to support applying this exception.  Therefore, we **AFFIRM** the district court's decision granting Germany's motion to dismiss.

**I.**

Fred Westfield,[1] in his capacity as the second administrator of the estate of Walter Westfeld, and the individual heirs of Walter Westfeld, brought this action to recover damages from the Federal Republic of Germany for the seizure and conversion of Westfeld's art and tapestry collection.  The Heirs contend that, while under Nazi control, German officials seized and sold the collection, which Westfeld had attempted to protect and bring to the United States.

———————————

[1]The members of the Westfeld family who emigrated to the United States and are parties to this action now use the spelling "Westfield."

Westfeld was a renowned art dealer in Germany in the 1930s. Nazi officials began persecuting and torturing Westfeld in 1933 because he was Jewish. Westfeld attempted to flee Germany with his art collection but his passport had expired and he was unable to get a visa from the United States. In 1938, German officials arrested Westfeld for what the Heirs refer to as a "trumped up" currency charge. Westfeld was sentenced to prison for three and a half years and fined Reichmarks 300,000 for the alleged currency violation. Before the sentence and fine were finalized, the District Attorney's Office in Düsseldorf ordered that Westfeld's art and tapestry collection be sold to satisfy the fine. The Heirs explain this was a common practice in Nazi Germany that allowed the government to raise funds. Lempertz, the German auction house, auctioned off Westfeld's collection under orders from the German government on December 12 and 13, 1939. The Heirs eventually obtained a copy of the auction catalogue, which describes more than five hundred tapestries and pieces of artwork from Westfeld's collection that Lempertz sold.

In prison, officials interrogated Westfeld and discovered that he had more artwork. From 1943 to 1944, after Westfeld had been killed, Nazi officials seized and sold the rest of his collection. After the war, the Regional Court Düsseldorf declared Westfeld's sentence and fine to be null and void.

In 2004, Fred Westfield discovered that the Boston Museum of Fine Arts was seeking information about his uncle, Walter Westfeld, in relation to a painting in its collection of Dutch Masters. Through the Museum, Fred learned that Germany had seized his uncle's art collection and discovered that much of it had been sold at auction by Lempertz.

The Heirs seek to recover the value of this property, arguing that Germany improperly seized it from Westfeld. Important to establishing jurisdiction, the Heirs contend that Westfeld had intended to send these items to Nashville, Tennessee where his brother lived. The complaint alleges that Germany's actions had a direct effect in the United States because they prevented valuable assets from reaching the United States, deprived Westfeld's family members in the United States the benefit of the property

intended for them, deprived Westfeld's family members of property that would have passed to them by intestacy, and deprived the United States art market of access to the collection.

Fred Westfield initiated an action in a Tennessee probate court, which appointed him administrator *de bonis non administratis*, the second administrator, of Walter Westfeld's estate. The probate court also designated the individual plaintiffs in this suit the sole heirs of Walter Westfeld after litigation with German citizens who also claimed to be heirs.[2]

The Heirs then filed this lawsuit in Tennessee state court. Germany removed to federal court and filed a motion to dismiss for lack of subject matter jurisdiction based on the Foreign Sovereign Immunities Act. The district court granted Germany's motion to dismiss and the Heirs appealed.

## II.

### A.      Standard of Review.

This Court reviews decisions regarding subject matter jurisdiction under the Foreign Sovereign Immunities Act de novo. *O'Bryan v. Holy See*, 556 F.3d 361, 372 (6th Cir. 2009). We may affirm the district court's judgment on any ground supported by the record, including on a basis not mentioned in the district court's opinion. *Louisiana Sch. Employees' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 477 (6th Cir. 2010); *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 547-48 (6th Cir. 1999). For purposes of this motion to dismiss, we must accept all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

---

[2]There appears to be some dispute as to whether the parties to this lawsuit are actually Westfeld's only heirs. However, as it does not affect the outcome in this case, we need not address this issue.

**B.** **The Commercial Activity Exception to Sovereign Immunity.**

The Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* (2006), provides the sole basis for a court in this country to obtain jurisdiction over a foreign sovereign. *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 611 (1992). The Act provides that a "foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604. The plaintiff has the burden of proving that one of the statutorily defined exceptions applies and the court has jurisdiction. *See Am. Telecom Co., L.L.C. v. Republic of Leb.*, 501 F.3d 534, 537 (6th Cir. 2007); *see also Verlinden B.V. v. Cent. Bank of Nig.*, 461 U.S. 480, 494 n.20 (1983) (requiring courts to determine that immunity is unavailable under the Act even if the foreign state does not enter an appearance).

At issue on this appeal is the "commercial activities" exception, 28 U.S.C. § 1605(a)(2), which provides that foreign sovereigns are not immune from suit in any case:

> [1] in which the action is based upon a commercial activity carried on in the United States by the foreign state; [2] or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; [3] or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

The Heirs rely on the exception contained in the third clause of this section and assert that Germany's act of seizing Westfeld's valuable art collection was "in connection with" the "commercial activity" of selling it on the private market. Although the district court rejected this argument, on appeal the Heirs quite persuasively navigate the morass of reported decisions and make a convincing argument that, based on Germany's sale of the collection at auction to raise capital, the seizure of Westfeld's artwork was sufficiently in connection with commercial activity to fall within this exception. However, we need not, and do not, decide whether the actions as alleged are sufficiently in connection with commercial activity to fall within this exception. Even if Germany's

actions were sufficiently in connection with commercial activity, Germany is nonetheless entitled to immunity because the Heirs have not established that those actions caused a direct effect in the United States.

### III.

The district court did not reach the issue of whether Germany's actions caused a direct effect in the United States in light of its holding that the seizure of Westfeld's art collection was insufficiently connected to commercial activity.[3] "An effect is direct if it follows as an immediate consequence of the defendant's . . . activity." *Weltover*, 504 U.S. at 618 (internal quotations omitted). The effect need not be foreseeable or substantial but "jurisdiction may not be predicated on purely trivial effects in the United States." *Id.*; *see also Virtual Countries, Inc. v. Republic of S. Afr.*, 300 F.3d 230, 236 (2d Cir. 2002) ("Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States." (internal quotations omitted)). Unlike some of our sister circuits, we have expressly rejected the requirement that a "legally significant act" take place in the United States in order to establish a direct effect.[4] *Keller v. Cent. Bank of Nig.*, 277 F.3d 811, 817-18 (6th Cir. 2002); *see Am. Telecom*, 501 F.3d at 539-40. When considering whether an action caused a direct effect in the United States we are cognizant of the Act's presumption that foreign sovereigns are immune, and wary of applying this requirement too loosely such that our courts become a haven for airing the world's disputes.

Courts have struggled to announce objective standards and clear rules for determining what does and does not qualify as a direct effect in the United States. Without objective standards to guide us, much of our analysis is drawn from comparison to other decisions addressing the scope of the direct effect requirement, many of which involve bonds issued by foreign governments. For example, *Weltover* involved bonds

---

[3] While the district court did not reach this issue, Germany addressed the direct effect requirement in its brief, and the Heirs responded to Germany's argument in their reply.

[4] This opinion refers to decisions from some of the circuits that require a "legally significant act" take place in the United States to find a direct effect. However, we do not adopt this requirement or refer to discussion relating to this requirement in the opinions that are cited.

issued by Argentina that allowed the creditor to elect to receive payment in either the London, Frankfurt, Zurich or New York markets. *Weltover*, 504 U.S. at 609-10. Argentina attempted to reschedule payment on the bonds and the bondholders demanded immediate payment in New York. *Id.* at 610. The Supreme Court held that Argentina's refusal to pay caused a direct effect in the United States. *Id.* at 618-19. "Because New York was thus the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a 'direct effect' in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming." *Id.* at 619.

Similarly, when considering claims arising out of a scam perpetrated by an individual purporting to be an official in the Nigerian government, we concluded that the direct effect requirement was satisfied when the foreign government failed to comply with its alleged obligation to make payment in the United States. *Keller*, 277 F.3d at 814, 818. The plaintiff in *Keller* alleged that the Central Bank of Nigeria, an entity controlled by Nigeria and entitled to sovereign immunity, had agreed to pay funds to an account at a bank in Cleveland, Ohio but failed to do so. *Id.* at 818. Because of the preexisting duty to pay funds in the United States, we concluded that, as in *Weltover*, the failure to do so caused a direct effect in this country. *Id.*; *accord Hanil Bank v. PT. Bank Negara Indon.*, 148 F.3d 127, 132 (2d Cir. 1998) (failing to remit funds to a designated bank account in the United States caused a direct effect in the United States); *Voest-Alpine Trading USA Corp. v. Bank of China*, 142 F.3d 887, 896 (5th Cir. 1998). However, here, the Heirs have not alleged that Germany ever promised to deliver Westfeld's art collection to the United States. Because Germany had not obligated itself to do anything in the United States, we cannot say that its actions caused a direct effect in the United States based on the *Weltover* line of cases.

The Heirs also cannot establish that Germany's actions had direct effects in the United States based on allegations that its expropriation of the artwork prohibited Westfeld from sending his collection to Nashville. Even this Court's recent decision in *DRFP L.L.C. v. Republica Bolivariana de Venezuela*, 622 F.3d 513 (6th Cir. 2010),

which liberally interpreted "direct effect," focused its analysis on whether the bonds allowed the holder to demand payment in the United States and not on where the creditor intended to move the funds on receipt. Over dissent, the majority concluded that the terms of the notes placed no restrictions on where the holder could demand payment. *Id.* at 517 (noting that the "parties implicitly agreed to leave it to the bearer to demand payment of the notes anywhere, including, perforce, Columbus, Ohio"). Because the majority believed that the holder could demand payment anywhere, when the holder demanded payment in Ohio, the failure to pay caused a direct effect in the United States. *Id.* at 518. Although the panel disagreed over the result, the dispositive issue was whether the terms of the bonds called for Venezuela to make payment in the United States. *Id.* If they did not, and the creditor merely intended to move funds it received in Venezuela to the United States, Venezuela's failure to make payment would not have caused a direct effect in the United States. *See id.* at 517; *id.* at 521 (Martin, J., dissenting). Here, the Heirs' allegations are, in a sense, that Germany interfered with Westfeld's plan to transfer property in Germany to the United States by unlawfully seizing it. However, although Germany's actions caused effects in the United States, our holding in *DRFP* does not establish that they were direct effects. Consistent with the *Weltover* line of cases, because Germany was under no obligation to send the collection to the United States, we cannot conclude that seizing the artwork in Germany caused a direct effect in the United States based on our decision in *DRFP*.

In contrast to situations where foreign sovereigns promised to pay funds to accounts in the United States, if the funds are only payable in a foreign country, failure to receive those funds does not cause direct effects in the United States. This is true even where the entity that was not paid alleges that it intended to transfer the funds to the United States on receipt. When funds are due abroad and not paid, the direct effects occur abroad. Although the entity might ultimately feel the financial injury at home in the United States, we have held that those reverberations are too attenuated to qualify as direct effects. *Am. Telecom*, 501 F.3d at 541; *see Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 78 (2d Cir. 2010) (noting that "the mere fact that a foreign state's commercial activity outside of the United States caused physical or financial injury to

a United States citizen is not itself sufficient to constitute a direct effect in the United States"); *Big Sky Network Can., Ltd. v. Sichuan Provincial Gov't*, 533 F.3d 1183, 1191 (10th Cir. 2008) (holding that "failure to receive promised funds abroad will not qualify as a 'direct effect in the United States'"); *Antares Aircraft, L.P. v. Fed. Republic of Nig.*, 999 F.2d 33, 36-37 (2d Cir. 1993) ("If a loss to an American individual and firm resulting from a foreign tort were sufficient standing alone to satisfy the direct effect requirement, the commercial activity exception would in large part eviscerate the [Act's] provision of immunity for foreign states."); *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1515 (D.C. Cir. 1988). The Heirs claim that Germany unlawfully seized Westfeld's art collection. Because Westfeld intended to send the art collection to the United States, this seizure interrupted those plans and ultimately affected his family in Nashville. However, this loss, suffered in the United States, is not a direct effect of Germany's actions. Seizing Westfeld's art collection caused a direct effect in Germany. Allegations that Westfeld intended to send his art collection to the United States do not broaden the scope of the direct effects. Although the action that prevented the transfer was in this case an illegal seizure and not a failure to pay, that does not distinguish the cases cited above, which recognize that a foreign country's actions do not cause direct effects in the United States merely because the entity to which it owed money planned to move the funds to the United States. While we do not question that Westfeld genuinely wished to transfer his artwork to Nashville, finding a direct effect based on plans to send property to the United States would largely eliminate the protections of sovereign immunity.

Unlike sovereigns that obligated themselves to make payment in the United States, the only reason effects were felt in the United States is because Westfeld had intended to send his art collection to Nashville. In *American Telecom*, we noted that the only immediate consequences, and hence direct effects, of disqualifying an American corporation from bidding on a contract to perform services in Lebanon were felt in Lebanon. 501 F.3d at 541 (noting that "everything else is entirely derivative of that action, and therefore not an 'immediate consequence' and not a direct effect"). Although we do not hold that the only actions that may cause a direct effect in the United States

are those where the sovereign is obligated to perform in the United States, similar to *American Telecom*, here, Germany's actions did not extend beyond its borders. The only connection to the United States is through Westfeld and derivative of Germany's action. As appalling as the Nazis' actions were, the reverberations felt from them in Nashville were derivative of Germany's seizure and not direct effects.

Consistent with this, we have also noted that the foreign sovereign's actions, and not the plaintiff's, must have caused the effects in the United States. In *American Telecom*, we held that the foreign sovereign's actions in disqualifying a United States corporation from submitting a bid on a project did not cause a direct effect in the United States where the performance was to occur entirely in a foreign locale. 501 F.3d at 541. One result of the sovereign's actions was that American Telecom lost $30,000 that it had paid from its United States bank account. However, that effect was not caused by the foreign sovereign. *Id.* (noting that the corporation "was not required to submit payment from an American bank; it chose to do so"). This approach is the only sensible way to apply the direct effect requirement. Otherwise, any payment to a foreign sovereign from a United States account would be sufficient to establish a direct effect and dissolve a foreign sovereign's immunity. Similarly, focusing on the plaintiff's actions and ties to the United States would be inconsistent with our prior decisions recognizing that an American entity's mere financial loss is insufficient to establish a direct effect in the United States. Therefore, this too counsels against concluding that Germany's actions caused a direct effect in the United States because Germany did not itself do anything here. The only ties to the United States are Westfeld's.

We recognize that "direct effect" is amorphous and hard to define. However, in light of the Supreme Court's pronouncement in *Weltover*, and our decisions interpreting this requirement, we hold that the Heirs have not alleged that Germany's actions caused a direct effect in the United States. The seizure undoubtedly prevented Westfeld from disposing of his collection, but any effects felt in the United States did not follow as an immediate consequence of Germany's actions. Germany acted entirely within its borders and the only connection to the United States is because Westfeld planned to send

the artwork to Nashville. The complaint does not state that Germany ever promised to send the artwork to the United States. Additionally, none of the Heirs or Westfeld's relatives in the United States had any actual ownership interest in the property at the time of the seizure. While Westfeld's plans to send the artwork to the United States meant that Germany's actions had effects here, they were not direct. Concluding otherwise would effectively read the "direct" requirement out of the statute and greatly expand the jurisdiction of our courts in contrast to Congress's goals in enacting the Foreign Sovereign Immunities Act.

Although we are very sympathetic to the Heirs' claims, we cannot conclude that Walter Westfeld's intention to transfer the proceeds to the United States caused a direct effect here. Our longstanding tradition of foreign sovereign immunity, and prior decisions recognizing that an American entity's failure to receive funds due abroad does not cause direct effects in the United States, compel the conclusion that Germany's actions did not cause direct effects in this case. Accordingly, we hold that the district court did not err by granting the motion to dismiss for lack of subject matter jurisdiction. Germany's actions in seizing Westfeld's art and tapestry collection, as abhorrent as they were, do not fall within the commercial activity exception to sovereign immunity.

## IV.

We find the Heirs' argument that this case does not involve a sovereign act because a German court declared Westfeld's sentence and fine "null and void" unpersuasive. Sovereigns were historically entitled to absolute immunity and the Act was intended to codify the "restrictive theory" of sovereign immunity, waiving immunity only in certain limited situations. *Verlinden B.V.*, 461 U.S. at 488; *see also Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 703 (1976). Although the Heirs are correct in arguing that it would be "nonsense" to require a domestic court to respect the acts of a foreign state that the foreign state itself declared null and void, that is not what this Court is being asked to do here. Rather, this Court is being asked to *not* consider the actions—the initial fine and imprisonment or the subsequent declaration that the acts were null and void. These actions, even though they have been declared

null and void, and even though they constituted an abuse of police and prosecutorial powers by the German government at the time, were nonetheless the acts of a sovereign. Congress did not create an exception for lawless activities in the Act. Therefore, even though we agree that this Court should not recognize Westfeld's fine and imprisonment, it should still respect that they were acts of a sovereign.

## V.

We are deeply sympathetic to the loss the Heirs suffered as a result of Germany's unspeakable acts. However, our jurisdiction is limited by both Article III of the Constitution and the statutes Congress enacts. We must operate within those restrictions, and because the Heirs failed to establish that Germany's actions caused a direct effect in the United States, their claims do not fall within the commercial activity exception to sovereign immunity. Therefore, the district court's decision dismissing this action is **AFFIRMED**.